MARCUS DENISON, Administrator of HENRY C. DENISON, *vs.* GEORGEANA B. DENISON.

*Marriage—Evidence inadmissible under the Acts of 1864, ch. 109, and 1868, ch. 116—Exceptions to the admissibility of Evidence—Practice in the Court of Appeals.*

A marriage contracted in this State merely *per verba de præsenti*, or *per verba de futuro cum copula*, is not lawful. To constitute a lawful marriage, some religious ceremony must be super-added to the civil contract.

In a controversy between the alleged wife of an intestate and his administrator, involving her right to a distributive share of the intestate's estate, her testimony is inadmissible under the Act of 1864, ch. 109, as modified by the Act of 1868, ch. 116, to prove her marriage with the deceased.

On appeal from an order of the Orphans' Court, exceptions to the admissibility of evidence or to the competency of testimony, may be taken and insisted on in the Court of Appeals, though not taken in the Court below.

APPEAL from the Orphans' Court of Baltimore City.

The case is sufficiently stated in the opinion of the Court.

The cause was argued before BARTOL, C. J., STEWART, BOWIE, BRENT and ALVEY, J.

*A. Stirling, Jr.,* and *I. Nevett Steele,* for the appellant.

By the ancient common law a marriage was invalid unless celebrated in the face of the church. *Coke Litt.,* 33a, *n.* 10; *Paynes' Case,* 1 *Sidf.,* 13 ; *Foxcrofts' Case,* 1 *Rolles' Abrid.,* 359 ; *Del Heiths' Case, cited from Harl. MSS., in a note to the Queen vs. Millis,* 10 *Cl. & Fin.,* 550 ; 2 *Bright's Husb. and Wife, App.,* 369, *et seq.* ; *Hayden vs. Gould,* 1 *Salkeld,* 119 ; *Welde vs. Chamberlaine,* 2 *Shower,* 300 ; *Holder vs. Dickeson,* 1 *Freeman,* 95.

Denison *vs.* Denison.

The most ancient legislation in England on marriage will be found in the law of Edmund, 10th century—1 *Ancient Laws,* · 257 *cited in Beamish vs. Beamish,* 9 *Ho. of Lords,* 312—which, after describing the espousals, provided :

8. "At the nuptials there shall be a mass priest by law, who shall, with God's blessing, bind their union to all prosperity."

9. "Well is it also to be looked to that it be known that they through kindship be not too nearly allied, lest that be afterwards divided which before was wrongly joined."

This was the state of the law from the earliest time to the time of Queen Anne, when by a dictum, Lord HOLT held that "a contract *per verba de præsenti* was a marriage, and not releasable." *Jesson vs. Collins,* 2 *Salk.,* 437 *and* 6 *Mod.,* 155 ; *Wigmore's Case,* 2 *Salk.,* 437.

This dictum of Lord HOLT's was the origin of all the subsequent opinions expressed by different judges to the same effect. *The Queen vs. Millis,* 10 *Cl. & Fin.,* 670.

In 1861 the case of *The Queen vs. Millis,* was affirmed by the unanimous opinion of the English Judges and lords in the case of *Beamish vs. Beamish,* 9 *House of Lords Rep.,* 274 *to* 360.

In this last case it was held, that the fact that the bridegroom is himself a clergyman in holy orders, there being no other clergyman present, will not make the marriage valid. *Semble,* that the decision in *The Queen vs. Millis,* is not to be applied to a case where the presence of a minister is impossible.

The common law required the presence of a clergyman at a marriage, because :

1st. A religious ceremony had by custom immemorial been superadded to the contract.

2d. The clergyman acted as a trustworthy witness, preserving evidence of and giving notoriety to the contract.

3d. The clergyman had the power to forbid and to prevent illegal and incestuous marriages. *Beamish vs. Beamish,* 9 *Ho. of Lords,* 302 *et seq.*

In *The Queen vs. Millis*, all the authorities are reconciled upon the theory that a contract *per verba de præsenti* was an incomplete marriage under the ecclesiastical law, enabling either of the contracting parties to apply to an Ecclesiastical Court, and compel the other, under penalty of clerical censure, to have a marriage solemnized *in facie ecclesiæ;* and until such marriage was solemnized, dower, curtesy and administration could not be obtained by either party.

Marriages by promise *cum copula* and *per verba de futuro* are ecclesiastical figments, and are only known to the common law, as giving the woman a right to an action for damages for seduction in the former case, in the latter either party a suit for breach of promise. 2 *Parsons on Cont.,* 79.

The idea of marriage by cohabitation and repute, arose from a misinterpretation and misapplication of those authorities, where on a collateral issue, evidence of general reputation, cohabitation and acklowledgment when uncontradicted, has been held as sufficient proof of marriage, upon a presumption, that a marriage at some time had been actually solemnized. 2 *Parsons on Cont.,* 77.

The common law required that the religious service prescribed by the church should be substantially performed, and did not nullify a marriage on account of the omission of an immaterial part of the service. *Catterall vs. Catterall,* 1 *Robertson,* 580; *Catterwood vs. Coslen,* 13 *Mees. & Wels.,* 264; *Catterall vs. Sweetman,* 1 *Robertson,* 304.

Such being the rule of the common law, determined after a long, patient, laborious and thorough examination of all the authorities by the most eminent legal minds in England, that no marriage is valid unless celebrated by a clergyman of the established church of that country, in holy orders, it follows, that if the people of Maryland are entitled to the common law of England as they are declared to be entitled by Article 3 of their Bill of Rights, and by the judgment of this Court in the case of *Harrison vs. Harrison,* 22 *Md.,* 487, that such must be the rule of law in force here, except in so far as it has been modified by law, custom and practice.

By the laws of the United States, there is no established church, and it is a source of pride to Marylanders, that early in the colonial history, by the Act of Toleration, perfect freedom of conscience and of religious belief was allowed.

The conclusion irresistably follows, that the rule of the common law has been relaxed and modified in Maryland to the extent of legalizing any marriage solemnized by the ceremony of any religion recognized as lawful. *Fornshill vs. Murray*, 1 *Bland*, 479.

*Cheseldine's Lessee vs. Brewer*, 1 *H. & McH.*, 152, (ejectment,) and *Sellman vs. Bowen*, 8 *G. & J.*, 54, (a bill in equity for *mesne* profits after complainant had recovered dower at law,) are cases where the question of marriage was collaterally involved, and uncontradicted evidence of general reputation, cohabitation and acknowledgement was held sufficient proof of marriage.

In the latter case the question of the admissibility of the evidence was not before the appellate Court. See *Ray vs. Garrell*, No. 149, *April term*, 1868, *recorded in Liber G. E. & J. S. F.*, No. 1, *fo.* 90, *&c.*, of *"Opinions Unreported."*

The Legislature, in prescribing that persons shall marry according to the rites and ceremonies of the religious denomination to which they belong, certainly never contemplated any other kind of marriage than that celebrated by a minister of the Gospel, or attended by some religious solemnity. *Code of Pub. Gen. Laws, Art.* 60, *sec.* 4; *Act of* 1865, *ch.* 130; *Act of* 1868, *ch.* 42, *sec.* 1; 2 *Debates of Constitutional Convention*, 1864; *Harrison vs. Harrison*, 22 *Md.*, 468; *Crane vs. Meginnis*, 1 *G. & J.*, 474; *Wright vs. Wright's Lessee*, 2 *Md.*, 448.

The general doctrine prevailing throughout the different States of the Union is, that in those States where there are statutes regulating marriage, their provisions must be substantially complied with, or the marriage will be null.

In no States, except New York and Pennsylvania, can a legal marriage be contracted without a religious or magisterial

ceremony. 2 *Parsons on Contracts*, 74, *et seq.* Chancellor
KENT says : " If the contract be made *per verba de præsenti*,
and remains without cohabitation, or if made *per verba de
futuro*, and be followed by consummation, it amounts to a valid
marriage, *in the absence of all civil regulations to the contrary*"—
2 *Kent Com.*, 87. The words italicised were introduced into
the text after the decision in the case of *Jewell's Lessee vs.
Jewell*, 1 *How.*, 219, 234, which came before the Supreme
Court of the United States, on error from the Circuit Court
for the District of South Carolina. The Court below cited
the above passage from KENT, from an early edition, and
without the important clause italicised, and instructed the
jury that this was law. Upon exception and appeal, TANEY,
C. J., in giving the opinion of the Court, says : " Upon the
point thus decided, this Court is equally divided ; and no
opinion can therefore be given." The case was decided on
other exceptions.

Bishop differs from all other text-writers and authorities
on the law of marriage—in regarding marriage as a *status*
and not as a *contract.* 1 *Bishop on Mar. and Div.*, sec. 3.

The statute regulations of marriage in Vermont are similar
to those of Maryland, and the Supreme Court of that State,
in referring to the New York authorities, says—" In these,
(*Fenton vs. Reed*, 4 *Johns.*, 51 ; *Van Buskirk vs. Clare*, 18
*Johns.*, 346,) and other New York cases, stress is laid upon
the fact, that a marriage *per verba de præsenti* is valid in that
State, and also at common law, if followed by cohabitation.
This, I think, could hardly be regarded as law in this State,
without virtually repealing our statute upon that subject. It
certainly has never been so regarded under English statutes,
26 Geo. II, and 4 Geo IV, ch. 76 ; and I see no reason why
it should be here, when it is clearly a dispensation with all the
requisitions of the statute upon the subject, wherever that rule,
in regard to the law of marriage, prevails, as it does in
Scotland, cohabitation as man and wife is marriage ; since it
implies in the strongest sense, a contract in *præsenti* to be

husband and wife." *Northfield vs. Plymouth,* 20 *Vermont,* 591; *Compiled Statutes of Vermont,* 392, *Tit. Dom. Relations.*

For a similar doctrine in other States, see *Millford vs. Worcester,* 7 *Mass.,* 48; *Londonderry vs. Chester,* 2 *N. H.,* 268, 279; *State vs. Kean,* 10 *N. H.,* 347; *Dunbarton vs. Franklin,* 19 *N. H.,* 257; *Clark vs. Field,* 13 *Vermont,* 460; *Mangue vs. Mangue,* 1 *Mass.,* 240; *Commonwealth vs. Spooner,* 1 *Pick.,* 234; *Roberts vs. State Treasurer,* 2 *Root,* (*Conn.,*) 381; *Pearson vs. Howey,* 6 *Halstead,* (*N. J.,*) 13; *State vs. Samuel,* 2 *Dev. & Bat.,* 177; *State vs. Robbins,* 6 *Ired.,* 23; *State vs. Bray,* 13 *Ired.,* 289.

In *Kuhl vs. Knauer,* 7 *B. Monroe,* 130, (*Ky.,*) the Court held that while proof of cohabitation and recognition by the parties of each other as man and wife, is for most purposes deemed sufficient proof of marriage, subject however to be rebutted, where the issue is marriage, *vel non,* such evidence is insufficient, and a marriage in fact must be proved.

In Tennessee, strict compliance with the statute is required under a penalty of nullity of marriage. *Bashaw vs. State,* 1 *Yerg.,* 177; *Grisham and Ligan vs. State,* 2 *Yerg.,* 589.

As to the law in other States, see: *Nichols vs. Stewart,* 15 *Tex.,* 227; *Sapp. vs. Newsom,* 27 *Tex.,* 537; *State vs. Willis,* 4 *Eng.,* (*Ark.,*) 197; *Letters vs. Cady,* 10 *Cal.,* 533; *Johnson vs. Johnson,* 30 *Mo.,* 72.

*James A. Buchanan* and *E. Beatty Graff,* for the appellee.

At the time this marriage was contracted, entered into and consummated, viz: the 17th January, 1863, the common law relative to marriage, was in *force* in Maryland, and was (and always had been and now is) a part of the organic law of the State, by virtue of the Declaration of Rights of 1851, Art. 3. Said law was not abolished by said Declaration of 1851, nor repealed prior to 1863 by the Legislature adopting the Code, Art. 60—Marriage—and secs. 124 to 133, of Art. 30; nor has it since been abolished or repealed; common law marriages are not declared to be null and void by any statute or other law of Maryland.

This common law was, previously to the said Declaration of Rights of 1851, in force in Maryland, by the Declaration of 1776, Art. 3.

The Legislature, by the Act of 1777, ch. 12, known as the Maryland Marriage Act, did not repeal the common law, nor did it declare common law marriages to be void in this State. See *Declaration, &c.*, 1776, *Arts.* 3 *and* 33; *Act of* 1777, *ch.* 12; *Declaration, &c.*, 1851, *Arts.* 3 *and* 33, *and Code, Art.* 60, *Marriage—and sections* 124 *to* 133, *of Art.* 30.

The common law was also in force by the Declaration of Rights of 1864, Arts. 4 and 36; and it is *now* in *force* by the Declaration of Rights of 1867, Arts. 5 and 36, in *all* of which the *original* language is used with but slight variation.

In law, marriage is a civil contract, and has always been so held, treated and considered; it is also held to be so by churches and religious persuasions generally. " Every minister is left to the direction of *those laws* in every thing that regards the *civil contract* between the parties." *First Rubric, Book of Common Prayer, Matrimony.*

Only in the Roman Catholic Church, in places in which the decrees of the Council of Trent are in force, is marriage considered one of the sacraments in addition to being a civil contract. In speaking of clandestine marriages (and the marriage now under consideration was to a certain extent clandestine,) *this* Church declares, " In the United States, where the decrees of the Council of Trent have not yet been published, *these marriages,* although sinful, *are valid.*"

The fact that Courts and Legislatures have the power and authority by *law* to grant *divorces,* shows marriage to be a *civil contract;* a divorce is the annulling, by *law,* of the marriage contract, notwithstanding the *Divine law* prohibits it in cases where human law grants it. Marriage is a civil contract, and *common law* marriages are valid. *Cheseldine vs. Brewer,* 1 *H. & McH.,* 152; *Fornshill vs. Murray,* 1 *Bland,* 479, 482; *Sellman vs. Bowen,* 8 *G. & J.,* 50; *Crawford vs. Blackburn,* 17 *Md.,* 49; 2 *Kent Com.* (8 *Ed.,*) 51, 52; *Jewel*

Denison *vs.* Denison.

*vs. Jewel*, 1 *Howard*, 219 ; *Hallet vs. Collins*, 10 *Howard*, 181, 182 ; *Gaines vs. N. Orleans*, 6 *Wallace*, 642 ; *Fenton vs. Reed*, 4 *Johnson*, 52 ; *Jackson vs. Claw*, 18 *Johnson*, 346 ; *Clayton vs. Wardell*, 4 *Comstock*, 230 ; 3 *Bradford*, 151, 369, 373, 509 ; *Ferris vs. Pub. Admr.*, 4 *Bradford*, 28 ; *Jackson vs. Winns*, 7 *Wendell*, 47 ; *Rose vs. Clark*, 8 *Paige*, 574 ; *Starr vs. Peck*, 1 *Hill*, 270 ; *Christy vs. Clark*, 45 *Barbour*, 529 ; *Bissel vs. Bissel*, 55 *Barbour*, 325 ; *Van Tuyle vs. Van Tuyle*, 57 *Barbour*, 235 ; *Hayes vs. The People*, 25 *N. Y.*, 393 ; *Thorndell vs. Morrison*, 25 *Penna.*, 326 ; *Vincent's Appeal*, 60 *Penna.*, 228 ; *Lehigh Valley R. R. vs. Hall*, 61 *Penna.*, 361 ; *Parton vs. Hervey*, 1 *Gray*, 119 ; *Holmes vs. Holmes*, 6 *Lou. R.*, 470 ; *Dumaresly vs. Fishly*, 3 *A. K. Marshall*, 369, 1198 ; *Henderson vs. Cargill*, 31 *Miss.*, 367 ; *Graham vs. Bennett*, 2 *Calf.*, 503 ; *People vs. Anderson*, 26 *Calf.*, 129 ; *Hervey vs. Hervey*, 2 *Wm. Blackstone's R.*, 877 ; *McAdam vs. Walker*, 1 *Dow.*, 148 ; *Jesson vs. Collins and Wigmore's case*, 2 *Salkeld*, 437 ; *Jesson vs. Collins*, 6 *Modern*, 155 ; *Catteral vs. Sweetman*, 1 *Robertson Ecc. R.*, 314 ; *The King vs. Birmingham*, 8 *Barn. & Cres.*, 29 ; 4 *Burrows*, 2,057 ; *Dalrymple's Case*, 4 *Eng. Ecc. R.*, 485 ; *Birt vs. Barlow*, 1 *Douglas*, 174 ; 1 *Bishop on Mar. and Div.*, chaps. 12, 13, secs. 217, 218, 226 *to* 229, 233, 252, 269, 272, 274, 275, 278, 280, 283 *to* 289 ; *Reeves' Dom. Rela.*, 195, 196, 197, 198, 199, 200, *and notes*; *Swinburne on Espousals*, 286, 287 ; *Weightman on Marriage*, 50, 51.

Art. 60, and secs. 124 to 133, of Art. 30, of the Code, and the Act of 1868, ch. 42, *do not make it obligatory* upon persons to marry as provided by said laws ; said laws do not in express terms or otherwise declare all or any marriage (other than mentioned in secs. 1 and 8, of Art. 60,) contracted, entered into, celebrated and consummated contrary to said laws, to be *null and void*, nor do they say that *no other* form or rite of marriage shall be valid when marriage is entered into in Maryland.

These laws relating to marriage *are not compulsory ;* they are only *directory* to the *minister,* and were enacted for the

*convenience* of such persons who are "citizens and inhabitants" of Maryland, who *elect* to be married by a "minister of the Gospel;" they were also passed to create a *revenue* to the State (another instance or authority showing marriage to be a *civil* contract,) from licenses and from "fines" and penalties after "conviction." It is optional, in the absence of any *express prohibition* or repeal of the common law, with persons about to marry, to marry *either* under the common law (when not within the expressed prohibited degrees, or for causes named in secs. 1 and 8, of Art. 60,) or under the statute laws, and whether or not "convicted" or "fined," the marriage is valid, as much so as any other civil contract which is not *expressly* by statute or other law declared to be void for want of license; as valid as contracts of bargain and sale, and contracting without first having taken out a license to do so, in cases where licenses are required, but for the want of it the contract is *not expressly* declared to be void, the penalty being a money penalty or "fine."

The statute laws of Maryland are *directory only to the minister* who is authorized to celebrate the rites, and not to persons marrying. *Dumaresly vs. Fishly,* 3 *A. K. Marshall,* 369, 1198; *Holmes vs. Holmes,* 6 *Lou'a R.,* 462, 470; *State vs. Murphy,* 7 *Ala.,* 765; *Rodenburg vs. Sanks,* 2 *Watts,* 9; *Londonderry vs. Chester,* 2 *N. H.,* 268; *Parton vs. Hervey,* 1 *Robertson Ecc. R.,* 119; *Milford vs. Worcester,* 7 *Mass.,* 48; *Crane vs. McGinnis,* 1 *Gill,* 463; 1 *Bishop on Mar. and D.,* secs. 284, 285, 286, 287, 288, 289; *Reeves' Dom. Rela.,* 195, 196, 197, 198, 199, 200, *and notes; Tyler on Infancy and Cov.,* p. 816, secs. 625–627, 629–631—*p.* 859, secs. 652, 653.

There are four valid and legal modes of marriage under the *common law,* viz: By cohabitation and repute; by promise *cum copula;* by promise *per verba de præsenti;* by promise *per verba de futuro* followed by cohabitation. *McAdams vs. Walker,* 1 *Dow.,* 148.

ALVEY, J., delivered the opinion of the Court.

Denison vs. Denison.

The first question to be decided in this case arises upon the motion of the appellee to dismiss the appeal. The ground of the motion is, that the record has not been made up as required by law; that the Act of 1867, ch. 373, sec. 3, which provides for taking testimony in the Orphans' Court of Baltimore city by a stenographer, has not been complied with, inasmuch as the depositions have not been signed by the witnesses who testified, nor by the stenographer, or the presiding Judge of the Court. But in answer to this motion it is enough to say, that the record discloses nothing to indicate to this Court with certainty that the testimony was taken under the authority of the Act referred to. It may, for aught that appears, have been taken in the ordinary way; or, what is more likely, judging from the statement of counsel, it may have been taken under an agreement of the parties, whereby the signatures of witnesses, and of the stenographer and Judge were all waived. The mere fact that in the summary of costs, indorsed on the record, an item occurs for the services of a stenographer, is not such evidence that the testimony was attempted to be taken under and by authority of the Act of 1867, as will justify this Court in regarding it. The motion to dismiss therefore must be overruled.

The case being before us, the record presents questions of great and most delicate interest to society, and which would seem to be presented for the first time for direct adjudication in this State.

The appellee alleges herself to have been the lawful wife of Henry C. Denison, who lately died intestate, and, as his widow, entitled to the one-half of his personal estate; the intestate dying without children.

It is not pretended that there was ever any solemnization of marriage between the appellee and the deceased; but it is alleged by the appellee, that from the 17th of January, 1863, until the death of the intestate, he and she were husband and wife, they having mutually agreed from that time thenceforth to be and regard each other as such. That, in pursuance of

such agreement, they cohabited and lived together as man and wife; that the appellee was maintained and supported by the deceased, up to the time of his death, as his wife; and that they both acknowledged, recognized and acted towards each other in all things, as husband and wife, and were known, treated and reputed to be such, among their friends and acquaintances.

Upon proof taken, the Orphans' Court decided that the appellee had been lawfully married to the deceased, and that, as his widow, she was entitled to share in the distribution of his estate. It is from such decision that the present appeal is taken.

Without any special reference to the evidence, as to whether the allegations of the appellee are fully proved, the first question that presents itself is, whether such marriage as is here set up and relied on, can be maintained by the laws of this State?

It is contended on the part of the appellee that such marriage is good and effectual at the common law, or rather by the canon law; and that, as we have adopted the common law of England, of which the canon law forms part, this marriage must be sustained, having been contracted by the parties, as it is alleged, *per verba de præsenti.* This proposition, on the other hand, is controverted by the appellant, by whom it is contended, that such marriage, even if contracted as alleged, was not valid and binding, because it was not duly celebrated according to the rites of any church, or religious denomination of any kind whatever; and that the common law gives no sanction to any such marriage as that attempted to be established by the appellee.

In order to determine this question, we shall, in the first place, endeavor to ascertain and show what the common law of England required to make a valid and binding marriage, prior to the Marriage Act of 26 Geo. II, ch. 33; and, in the second place, what is required, either by the common or statute law of Maryland, in that respect.

By the canon law of Europe, founded mainly upon the Roman civil law, prior to the Council of Trent, in the sixteenth century, the contract of marriage was regarded as simply of a consensual nature, only differing from other contracts in its being indissoluble even by the consent of the parties. In form, a contract *per verba de præsenti*, or a promise *per verba de futuro cum copula*, constituted a valid marriage, without the offices of a priest, till the decrees of the Council of Trent, which required the intervention of the parish priest to give validity to the marriage. The promise *per verba de futuro*, when followed by carnal intercourse, was considered as equivalent in legal effect to the contract *per verba de præsenti*. In the matrimonial law, as administered by the canonist, it was a maxim, *consensus, non concubitus facit nuptias;* and this remains the law to the present day in some parts of Europe, where the civil and canon law prevail, and where the decrees of the Council of Trent have not been accepted,—as in Scotland. *Dalrymple vs. Dalrymple*, 2 *Hag. C. Rep.*, 54.

But the civil and canon laws, as such, never had force in England. They were regarded and accepted only as part of the common or unwritten law. Blackstone, in speaking of the subordinate character of these laws, says, that " it appears beyond a doubt that the civil and canon laws, though admitted in some cases by custom in some Courts, are only subordinate, and *leges sub graviori lege;* and that, thus admitted, restrained, altered, new-modelled and amended, they are by no means with us a distinct independent species of laws, but are inferior branches of the customary or unwritten laws of England, properly called the King's Ecclesiastical Law." 1 *Com.*, 84. And so Professor Wooddesson, in his *Lectures on the Laws of England*, (*Lect.* 5, *p.* 78,) says : " Many of our present ecclesiastical laws are undoubtedly of foreign extraction, and some are entirely of English origin. But now they all alike depend, as to their general binding authority, on the same foundations as the whole body of our English laws,

immemorial custom, and express Act of Parliament." The decrees of the Council of Trent, however, were never accepted or recognized to be of any force whatever in England.

The civil and canon laws, therefore, have no operation in England, except only as they may have been incorporated into the system of the common law; and in ascertaining what was the law of England in regard to the mode and manner of contracting marriage prior to or independently of the marriage Act of 26 George II., passed in 1753, we do not appeal to the civil or canon law as such, but to the common law as a system peculiar to England and her institutions.

What then, by the law of England, prior to the marriage Act, was the effect of an engagement of matrimony, such as is alleged to have been entered into by the parties here, merely *per verba de præsenti?* or, in other words, a contract of present marriage, without any solemnization or celebration whatever?

We can best answer this question by resorting to and quoting from some few standard authorities, which have been approved and repeatedly relied on by all the highest Courts in England, as containing a true and correct expression of the law.

*Perkins*, an author of high repute, who wrote in the time of Henry VIII., in his *Treatise on the Laws of England, secs.* 194, 195, 306, stated it as unquestionable law, that after a contract of marriage between a man and a woman, they were not one person in law, inasmuch as in case of the woman's death before the marriage *solemnized* between them, the man to whom she was contracted should not have her goods as her husband. And so again, he says, that if a man, seized of land in fee, make a pre-contract of matrimony with J. S. and die *before the marriage is solemnized*, she shall not have dower, for she never was his wife.

*Swinburne*, an author of the time of Queen Elizabeth, in his *Treatise on Espousals, sec.* 17, says: "Spousals *de præsenti*,

though not consummate, be in truth and substance very matrimony. Although by the common law of this realm, (like as it is in France and other places,) spousals, not only *de futuro*, but also *de præsenti*, be destitute of many legal effects wherewith marriage solemnized doth abound, whether we respect legitimation of issue, alteration of property in her goods, or right of dower in the husband's lands." And again he says : " Other, effects there be of spousals, whereof some respect the issue or children begotten before celebration of the marriage betwixt those which have contracted spousals, and some have relation to their lands and goods. Concerning their issue, true it is that by the canon law the same is lawful; but by the laws of this realm, their issue is not lawful, though the father and the mother should afterwards celebrate marriage in the face of the church. Likewise concerning lands, by the canon law the foresaid issue may inherit the same; but it is otherwise by the laws of this realm, for, as the issue is not legitimated by subsequent marriage, no more can he inherit his father's land; and as he cannot inherit, no more is she to have any dower of the same lands, for whereas, by the laws of this realm, a married wife is to have the third part of her husband's lands, holden in fee-simple or fee-tail, either general or special, for her dower after her husband's death, during her life, so that she be above the age of nine years at her husband's death, yet, a woman having contracted matrimony, if the man to whom she was betrothed die before the celebration of the marriage, she cannot have any dower of his lands, because as yet she is not his lawful wife, at least to that effect. Concerning goods, the like may be said of them as hath already been spoken of lands, that is to say, that although by the civil and canon laws, where the man doth gain any of the woman's goods, or the woman gain any of the man's goods, by reason of marriage, spousals *de præsenti* or *de futuro*, consummate with carnal knowledge, have the same effect as hath matrimony solemnized, yet by the laws of this realm it is otherwise; so that neither spousals *de præ-*

*senti*, neither spousals *de futuro* consummate, do make her goods his or his goods hers; and hence it is that a woman contracted in matrimony, dying before the celebration of the marriage, may make her testament, and dispose of all her goods at her own pleasure, which after solemnization of the marriage she cannot do without his license and consent. And on the other side, the man dying intestate before celebration of the marriage, the woman to whom he was betrothed surviving cannot obtain the administration of his goods as his widow, which otherwise, the marriage being solemnized, she might do. And the like I read to be observed in divers other countries, as in France and Saxony, where neither he nor she gain any part of the other's goods by being affianced, unless the marriage be solemnized, if not consummate also."

The principle stated by *Perkins* and *Swinburne*, as to the inchoate nature of the marriage contract *per verba de præsenti* at the common law, is distinctly recognized by Lord HALE, in a manuscript note, which was incorporated by *Mr. Hargrave* among the notes to *Co. Litt.*, 33 *a*.

This distinction between the common law of England and the canon law of Europe, unaffected by the decrees of the Council of Trent, as to the force and effect of the contract of marriage *per verba de præsenti*, has been very distinctly recognized to exist by the most distinguished Judges of the Ecclesiastical Courts of England. In the case of *Scrimshire vs. Scrimshire*, 2 *Hag. C. R.*, 395, a cause for the restitution of conjugal rights, decided in 1752, by Sir EDWARD SIMPSON, that learned Judge, in declaring against the legality of the marriage in that case, said: "And I apprehend, unless persons in England are married according to the rites of the Church of England, they are not entitled to the privileges attending legal marriages, *as thirds, dower, &c.*" So, in the case of *Dalrymple vs. Dalrymple*, before referred to, Sir WILLIAM SCOTT, in the course of the celebrated judgment delivered by him in that case, involving the marriage law of Scotland, as distinguished from the law of England, after citing

*Swinburne* in support of his positions, said, that " the common law had scruples in applying the civil rights of dower and community of goods and legitimacy, in the cases of these looser species of marriage," meaning the marriages recognized by the civil and canon law, as it prevailed in Scotland, unaffected by ecclesiastical decrees.

Perhaps the law is found nowhere better or more clearly stated than in *Park on Dower*—a very learned and reliable authority. He says, page 8, that, " By the ecclesiastical law, as it stood previous to the Marriage Act, (26 *George* II., *C.*, 33,) and as it still stands as to cases falling within the exceptions of that Act, the existence of matrimony involved a twofold consideration; comprising, within that general name, the distinct facts, 1st. the espousals, or personal contract between the parties to become husband and wife; and, 2dly. the celebration of that contract *in facie ecclesiæ.* The espousals, or matrimonial contract, which, though requiring no set form or ceremonial, was the substance or bond of the nuptial relation, was of two kinds, viz: *per verba de præsenti*, or *per verba de futuro.* The former of these, in the contemplation of the ecclesiastical law, amounted to very matrimony, the contract being indissoluble by any agreement of the parties; and rendering any subsequent marriage of either of them with any third person absolutely void. But though espousals, or affiance, as it is sometimes termed, was thus the very substance of matrimony, and even by the temporal lawyers, the terms affiance and marriage were often promiscuously used, yet it does not seem to have been allowed that espousals alone, unaccompanied by celebration, should confer the civil rights of dower or legitimacy; but to obtain these temporal advantages it was requisite that the contract of matrimony should be *celebrated* in the face of the church. And though in one case a woman who had made a contract of marriage *per verba de præsenti*, but whose marriage had not been celebrated till after the alienation of the husband, recovered her dower upon the ground that the alienation of· the land by the husband in

the interval between a sentence of the Ecclesiastical Court for execution of the contract, and the celebration of matrimony pursuant to that sentence, was a fraudulent alienation, *quoad* the wife, yet this recovery was reversed *coram rege et concilio,* because neither the contract nor the sentence was a marriage by the temporal law, and so the husband had no *seisin* during his marriage with the demandant." The author cites the note of Lord HALE, to *Co. Little* 33 *a.*

From all the common law authorities it would appear that the contract *per verba de præsenti,* or *per verba de futuro cum copula,* could be carried into effect and execution by the Ecclesiastical Courts. But until such contract was sanctioned by religious ceremony, duly performed, the marriage was incomplete, and did not confer the civil rights incident to the married state.

. In 1843, the celebrated case of *Reg. vs. Millis,* 10 *Cl. & Fin.,* 534, involving the legality of a marriage not celebrated according to the rites of the Church of England, was brought into the House of Lords, on appeal from the Queen's Bench in Ireland. It was a case to which the Marriage Act of 26 George II did not apply. The appellee, *Millis,* having contracted two marriages, and being indicted for bigamy, the question was whether the first marriage was legal and complete, not having been celebrated according to the rites of the Church of England, to which the accused belonged. The case was most elaborately argued, both at the bar and by the Judges who participated in the decision. All the learning upon the subject was fully developed and illustrated. The opinion of the Judges of England was taken, and by their unanimous opinion, as delivered by Chief Justice TINDALL, it was declared "that by the law of England, as it existed at the time of the passing of the Marriage Act, a contract of marriage *per verba de præsenti* was a contract indissoluble between the parties themselves, affording to either of the contracting parties, by application to the Spiritual Court, the power of compelling the *solemnization of an actual marriage;*

but that such contract never constituted a full and complete marriage in itself, unless made in the presence and with the intervention of a minister in holy orders." The judgment of the Court below being against the validity of the first marriage, and the law Lords being equally divided in opinion, the rule "*semper præsumitur pro negante*" applied, and judgment was affirmed.

The same question, but in a different form, was again presented to the House of Lords in 1861, in the case of *Beamish vs. Beamish*, 9 *H. L. Cas.*, 274; and by the unanimous opinion of the Judges and the law Lords who heard the case, the decision in *Reg. vs. Millis* was reäffirmed. In these cases will be found all the learning upon the subject of what is called canon law marriages, as distinguished from marriages celebrated with religious solemnity.

Such then being the law of England upon this subject, prior to and independently of the Marriage Act of 26 George II, which was never adopted in this State, in what does that law differ from the law as it has heretofore existed and still exists, in this State?

It is true the common law of England has been adopted by the people of this State; but only so far as it could be made to fit and adjust itself to our local circumstances and peculiar institutions. The ecclesiastical polity of England forms no part of the common law as we have adopted it. We have in our system no tribunal, as in England, clothed with power and jurisdiction to enforce the solemnization of marriages between parties contracting *per verba de præsenti*. Unless, therefore, there be something in the law of this State, apart from the common law of England, to render such contracts valid without solemnization, it follows, necessarily, that they can, at most, only be valid to the extent that they are good at the common law without solemnization; and, as we have seen, such unsolemnized contracts are incomplete, and are not effectual to confer legitimacy upon the issue, nor the rights of property upon the parties,—a right that is attempted to be enforced in this case.

But is there any principle or provision of law peculiar to this State, that would render valid and effectual the marriage here set up, so that it would confer the rights of property and carry the other legal incidents of a valid marriage? We know of none. On the contrary, we think we are safe in saying, that there never has been a time in the history of the State, whether before its independence of Great Britain or since, when some ceremony or celebration was not deemed necessary to a valid marriage. In the early days of the province it was not absolutely necessary that a minister of religion should officiate,—a judge or a magistrate could perform the ceremony,—but still, in all cases, some formal celebration was required. *Act* 1715, *ch.* 44, *sec.* 24. The whole subject was particularly regulated by the Act of 1717, ch. 15, so far as the members of the Church of *England* were concerned. Persons of other denominations were allowed to be married according to preëxisting law. But these acts clearly show that no such marriage as that here alleged to have been contracted was ever contemplated by the Legislature, or was ever supposed for a moment to be good. The Act of 1777, chap. 12, concerning marriages, and which forms Art. 60, of the Code, plainly indicated the understanding of the Legislature to be that no marriage was to be thereafter good and valid, unless celebrated by some religious rites and ceremony. It expressly provided that the *rites* of marriage should not be celebrated by any person within this State, unless by some ordained minister, or in such manner as was used and practised by the Society of Quakers. It moreover provided that no person within the State should marry without first obtaining a license, to be directed to a minister or other person qualified by law to celebrate marriage in the State; or, until after banns published in some house of religious worship, or by a minister, as therein directed; and it prescribed a penalty upon parties going out of the State to be married contrary to the provisions of the Act. Why this latter provision, if valid marriages could be contracted in the manner contended for by the counsel for the appellee?

It is true, the Act contains no express prohibition or declaration of absolute nullity of marriages contracted *per verba de præsenti;* but it is plainly to be perceived that such marriages, if allowed, would contravene the spirit and policy of the Act. The implication from the provisions of the Act are exceedingly strong against such marriages, and the practice and custom of the people of the State have been so universally in conformity with what would appear to have been the policy and requirement of the law, that such custom has acquired the force and sanction of law; even though a question could be made as to the technical construction of the Act itself. Besides, as we have seen, an unsolemnized contract of marriage, at the common law, is inchoate merely, or incomplete, being ineffectual to confer many of the most important rights of the matrimonial state; and to supply the defect of solemnization, positive law was required. Such positive law has never been provided, and, consequently, a marriage contracted in this State merely *per verba de præsenti,* or *per verba de futuro cum copula,* has no sanction in our law, whatever may be the law upon this subject elsewhere. To constitute lawful marriage here there must be superadded to the civil contract, some religious ceremony. The law, however, does not prescribe the form, nor according to the rites of what Church the marriage shall be celebrated.

The case of *Cheseldine vs. Brewer,* 1 *H. & McH.,* 152, decided in 1739, relied on by the appellee, is not entitled to the authority attributed to it. It was a case occurring at the Assizes for St. Mary's County, and it is not shown by what Judges it was decided, nor upon what ground the decision on appeal proceeded. It would appear that the question raised was simply as to the effect of evidence to give rise to the presumption of legal marriage. The case is very shortly and imperfectly reported, and there is nothing in it to give it the force of authority.

So far as we are informed, this is the first instance in which a marriage contract of the nature of the one here set up,

Denison *vs.* Denison.

alleged to have been made in this State, has ever been attempted to be maintained, as constituting a valid marriage, in any of our Courts. These loose and irregular contracts, as a general thing, derive no support from morals or religion, but are most generally founded in a wanton and licentious cohabitation. Hence the law of the State has given them no sanction.

In this case, however, if the law were different from what it is, the claim of the appellee could not be sustained. The appellee is objected to as an incompetent witness, and without her testimony, the evidence is insufficient to prove clearly the alleged marriage. The other alleged contracting party being dead, and this being a controversy with his administrator, the appellee is clearly incompetent under the Act of 1864, as modified by the Act of 1868. The appeal being from the Orphans' Court, exceptions to the admissibility of evidence or the competency of witnesses are not required to be taken in the Court below, but may be taken and insisted on in this Court. *Stewart vs. Pattison,* 8 *Gill,* 46. In no view therefore could her pretensions be supported.

The decision of the Orphans' Court will be reversed, and the cause remanded that the petition of the appellee be dismissed.

*Order reversed and*
*cause remanded.*

(Decided 15th March, 1872.)

Note.—Judges Grason, Miller, and Robinson who did not sit at the hearing of the aforegoing case, have directed the Reporter to say, that having considered the questions involved, and united in the consultation with the other Judges, they concur in the opinion of the Court.