## COMMONWEALTH *vs.* HENRY J. MUNSON.

Worcester.   Sept. 30. — Oct. 27, 1879.   ENDICOTT & LORD, JJ., absent.

A ceremony, performed by a man and woman in good faith as a marriage rite, no third person participating, and no magistrate or minister, nor any person believed to be such, being present, and neither party being a Friend or Quaker, does not constitute a valid marriage under the laws of this Commonwealth.

The mere fact of cohabitation, under an honest, though mistaken, belief that the parties cohabiting are lawfully married, will not support an indictment, on the Gen. Sts. *c.* 165, § 6, for lewd and lascivious cohabitation, if the cohabitation is not under such circumstances as to create a common scandal, or tend to corrupt the public morals.

INDICTMENT, on the Gen. Sts. *c.* 165, § 6, for lewd and lascivious cohabitation with Martha A. Eaton.

At the trial in the Superior Court, before *Gardner*, J., the cohabitation with Eaton at the time and place alleged was admitted by the defendant. The defence was that the alleged parties during all the time of such cohabitation were lawfully married to each other.

It appeared in evidence, and was not contested by the government, that, at a public religious meeting called by the defendant, held at the Advent Chapel in Worcester, on July 12, 1879, at which about fifty persons were present, and at which no magistrate or minister of the gospel was present, the defendant occupied the pulpit, gave out a text, talked awhile about repentance, then read the first five verses of the twentieth chapter of Matthew, and then stepped down the aisle, and said Eaton came forward and read from the sixth to the tenth verse of the same chapter; that they then joined hands, and the defendant said, " In the presence of God and of these witnesses, I now take this woman whom I hold by the right hand to be my lawful wedded wife, to love and to cherish, till the coming of our Lord Jesus Christ, or till death do us part; " that Eaton thereupon said, " And I now take this man to be my lawfully wedded husband, to love, reverence and obey him until the Lord himself shall descend from heaven with a shout and the voice of the archangel and with the trump of God, or till death shall us sever; " that the parties then bowed down, and the defendant offered prayer; that there was no other marriage ceremony; that neither party

was a Friend or Quaker; that the marriage ceremony was not conformable to the usage or practice of any religious sect; that the parties were of full age, the defendant being a resident of Missouri, and Eaton being a resident of Worcester; that the parties performed this ceremony in good faith as a marriage rite, and believed it constituted a valid marriage; that directly after the ceremony, and during the time covered by the indictment, the parties cohabited together as husband and wife under the belief that they were lawfully married; that before the ceremony was performed, the parties caused notice of their intention to be joined in marriage to be entered in the office of the city clerk of Worcester, and the clerk delivered to them the certificate required by the statute; and that the certificate was returned with a statement thereon, signed by the parties, stating that they had been married to each other by mutual public vows.

Upon these facts, the judge ruled that no valid or lawful marriage between the parties had taken place; and instructed the jury that they would be warranted in convicting the defendant.

The jury returned a verdict of guilty; and the judge, being of opinion that the question of law raised in the case as to the validity of the assumed marriage was so important and doubtful as to require the decision of this court, at the request of the parties, reported the case for its consideration. If the ruling and instruction were right, the verdict was to stand; otherwise, the verdict was to be set aside.

*J. F. Manning*, for the defendant, cited 1 Bishop Mar. & Div. §§ 283–287; Gen. Sts. *c.* 106, §§ 21, 22; *c.* 107, §§ 4, 5; *Mangue* v. *Mangue*, 1 Mass. 240; *Milford* v. *Worcester*, 7 Mass. 48; *Parton* v. *Hervey*, 1 Gray, 119; *Meyers* v. *Pope*, 110 Mass. 314; *Flora's case*, Quincy, 29, note; *Concord* v. *Goffstown*, 2 N. H. 263; *Hutchins* v. *Kimmell*, 31 Mich. 126; *Dyer* v. *Brannock*, 66 Misso. 391; *McCausland's estate*, 52 Cal. 568; *Meister* v. *Moore*, 96 U. S. 76.

*G. Marston*, Attorney General, for the Commonwealth.

GRAY, C. J. In Massachusetts, from very early times, the requisites of a valid marriage have been regulated by statutes of the Colony, Province, and Commonwealth; the canon law was never adopted; and it was never received here as common law, that parties could by their own contract, without the presence

of an officiating clergyman or magistrate, take each other as husband and wife, and so marry themselves. *Milford* v. *Worcester*, 7 Mass. 48, 53. 2 Dane Ab. 291, 301. 2 Winthrop s Hist. New England, 43. This clearly appears on tracing the history of the legislation upon the subject; the whole of which, whether repealed or unrepealed, is by a familiar rule to be considered in ascertaining the intention of the Legislature. *Church* v. *Crocker*, 3 Mass. 17, 21. *Eaton* v. *Green*, 22 Pick. 526, 531. *Commonwealth* v. *Bailey*, 13 Allen, 541, 545.

As early as 1639, it was "ordered and declared" by the General Court, "that there be records kept of the days of every marriage, birth and death of every person within this jurisdiction." 1 Mass. Col. Rec. 276. Anc. Chart. 43. In 1642, it was enacted that "the magistrates and other persons appointed to marry shall yearly deliver to the recorder of that court which is nearest to the place of their habitation the names of such persons as they have married, with the days, months and years of the same; and the said recorders are faithfully and carefully to enrol such marriages as shall thus be committed to their trust;" and in 1644, every new-married man was required "to bring in a certificate of his marriage, under the hand of that magistrate which married him, to the clerk of the writs," to be recorded. 2 Mass. Col. Rec. 15, 59. Mass. Col. Laws (ed. 1660) 68; (ed. 1672) 130. Anc. Chart. 181.

The requisite of solemnization before a magistrate or other authorized person, as essential to constitute a valid marriage, which had been clearly implied in these statutes, was distinctly expressed in the following statute of 1646: "As the ordinance of marriage is honorable amongst all, so should it be accordingly solemnized. It is therefore ordered by this Court and authority thereof, that no person whatsoever in this jurisdiction shall join any persons together in marriage, but the magistrate, or such other as the General Court or Court of Assistants shall authorize in such place where no magistrate is near. Nor shall any join themselves in marriage, but before some magistrate or person authorized as aforesaid. Nor shall any magistrate, or other person authorized as aforesaid, join any persons together in marriage, or suffer them to join together in marriage in their presence, before the parties to be married have been published

according to law." Mass. Col. Laws (ed. 1660) 52; (ed. 1672) 102. Anc. Chart. 152.

In 1656 and 1658, the "commissioners for ending small causes in the several towns where no magistrate dwells" were "authorized and empowered to solemnize marriage between parties legally published;" "and all other commissions in this case are hereby made void." 4 Mass. Col. Rec. pt. i. 255, 322. Anc. Chart. 152. The provision of the St. of 1646, prohibiting persons to join themselves in marriage, except before a magistrate or other authorized person, continued in force throughout the period of the colony charter.

By the Prov. St. of 1692–3 (4 W. & M.) c. 25, "every justice of the peace within the county where he resides, and every settled minister in any town, shall and are hereby re spectively empowered and authorized to solemnize marriages, within their respective towns and counties, betwixt persons that may lawfully enter into such a relation, having the consent of those whose immediate care and government they are under, and being likewise first published" as therein directed; and "every justice and minister shall keep a particular register of all marriages solemnized before any of them, and make a return thereof" quarterly to the clerk of the sessions of the peace of the county, to be by him registered. 1 Prov. Laws (State ed.) 61. Anc. Chart. 242.

By the Prov. St. of 1695–6 (7 W. III.) c. 2, § 4, "for the better preventing of clandestine marriages," it is enacted that "no person other than a justice of the peace, and that within his own county only, or ordained minister, and that only in the town where he is settled in the work of the ministry, shall or may presume to join any persons together in marriage; nor shall any justice or minister join any persons in marriage other than such one or both of whom are inhabitants or residents in such county or town respectively;" with more specific provisions as to publication of banns and consent of parents and guardians, and a further provision that any justice, minister or other person offending against this act shall suffer a penalty, and be "forever after disabled to join persons in marriage," and be also liable to an action by the parent or guardian. 1 Prov. Laws, 209, 210. Anc. Chart. 283.

By the Prov. St. of 1716–17 (3 Geo. I.) c. 16, after reciting in the preamble the principal passage above quoted from the act of 1695–6, it is enacted that "the power granted ministers to join persons together in marriage be hereby enlarged, so as that where there shall be no settled ordained minister in any town or precinct, or where the only settled ordained minister of any town or precinct is himself to be married, it shall and may be lawful in such cases for the next settled ordained minister in another town within the same county to join in marriage the minister, or inhabitants of such town or precinct destitute of such settled ordained minister, if such minister or inhabitants desire it, according to the rules prescribed by the laws of this Province for the consummating marriages;" and penalties are imposed on ministers and clerks neglecting to return or record marriages. 2 Prov. Laws, 60. Anc. Chart. 416.

So by an act of 1773 (13 Geo. III.) the authority of each minister of the Church of England within the Province to join persons in marriage, (which had previously been limited to persons belonging to the town in which the minister himself dwelt,) was not only extended to include persons usually worshipping with him and whose ministerial taxes he had a right by law to receive, although not belonging to the same town; but it was enacted that "where any minister of the Church of England is himself to be married, or where such minister shall be removed by death or otherwise, so that the religious society of Christians in which he presided shall be destitute of a minister, it shall be lawful in such cases for the next minister within the Province of the same denomination to join in marriage the minister, or any of the people constituting such religious society who may lawfully enter into such a relation." Mass. Perpetual Laws (Supplts. to ed. 1759) 632. Anc. Chart. 679.

These statutes plainly signify that by the law of the Province even a minister, authorized to solemnize marriages between other persons, could not marry himself.

The only other statutes of the Province which have come to our notice are one of 1727 (1 Geo. II.) providing for the publication of banns of persons residing in places where there was no town clerk, and one of 1763 (3 Geo. III.) concerning the powers of ministers whose parishes were made out of two or more adja-

cent towns. 2 Prov. Laws, 464. Mass. Perpetual Laws (Supplts. to ed. 1759) 444. Anc. Chart. 462, 655.

The Province laws on this subject remained in force until after our Revolution; and it was before they had been changed by any statute of the Commonwealth that the marriage took place, the validity of which was brought in question in the leading case of *Milford* v. *Worcester*, 7 Mass. 48. In that case it appeared that in 1784 a man and a woman went together into a room where a justice of the peace happened to be, and in his presence, and before other witnesses, after producing a certificate that their intentions of marriage had been published, the man declared that he took the woman as his lawful wife, and she declared that she took him as her lawful husband, and each made to the other the vows and promises usual in contracting marriages ; but upon the question whether this proceeding was directed and encouraged by the justice the evidence was conflicting. It was ruled by Mr. Justice (afterwards Chief Justice) Sewall at the trial, and held by the full court in an elaborate judgment delivered by Chief Justice Parsons, that, if the proceeding had not the sanction of the justice as a magistrate, the marriage was void, and neither the woman nor her children took the settlement of the man. The position that the marriage, though not solemnized pursuant to the statutes, was yet a lawful marriage, had between parties competent to contract marriage, and not declared void by any statute, was fully argued and considered ; and the court, while admitting the strength of that position in states the laws of which had prescribed no regulations for the celebration of marriages, was clearly of opinion that the provisions of our statutes, by necessary implication, prohibited persons from solemnizing their own marriages by any form of mutual engagement, or in the presence of any witnesses whatever.

The St. of 1786, c. 3, manifested no intention to change the law in this respect. While it expressly repealed all former laws relating to the solemnization of marriages, it substantially reenacted many of their provisions. It empowered justices of the peace within their counties, and stated and ordained ministers within their towns or parishes, to solemnize marriages ; provided that, when any such minister was himself to be married, it should be lawful for any other such minister within the same county to

marry him; required "all persons desiring to be joined in marriage" to have their intention published, and to "produce to the justice or minister who shall be desired to marry them" a certificate of such publishment; obliged justices and ministers to keep records and make returns of the marriages solemnized by them; and made persons illegally solemnizing marriages, or neglecting to make returns, subject to penalties, and to be thereafter disqualified from joining persons in marriage.

It also contained a new provision, declaring marriages which had been or should be had and solemnized among Quakers or Friends, in the manner and form used and practised in their societies, to be good and valid in law, and requiring the clerk or keeper of the records of the meeting at which such marriages should be had and solemnized to make returns thereof. St. 1786, c. 3, § 7. This section, Chief Justice Parsons tells us, was enacted in consequence of the general opinion of lawyers that such marriages were void before. *Milford* v. *Worcester*, 7 Mass. 56.

The St. of 1786 (after being amended in some unimportant particulars by the Sts. of 1795, c. 7, 1817, cc. 61, 141, and 1820, c. 55) was repealed by the St. of 1834, c. 177, which contained similar provisions, but allowed resident ministers to solemnize marriages throughout the Commonwealth, and therefore omitted as unnecessary the specific provision of former statutes as to the marriage of ministers, and also declared — thereby clearly implying that some solemnization beyond the mere contract of the parties was considered essential — that "all marriages, between persons who might lawfully enter into that relation, heretofore solemnized by any justice or minister, be and they hereby are confirmed and made valid in law, although such justice or minister may have exceeded his authority or jurisdiction."

In the Rev. Sts. c. 75, the provisions of the previous statutes are substantially reënacted, and the following section is added: "No marriage, solemnized before any person professing to be a justice of the peace, or a minister of the gospel, shall be deemed or adjudged to be void, nor shall the validity thereof be in any way affected, on account of any want of jurisdiction or authority in such supposed justice or minister, or on account of any omission or informality in the manner of entering the intention of marriage, or in the publication of the banns; provided, that the

marriage be in other respects lawful, and be consummated with a full belief, on the part of the persons so married, or of either of them, that they have been lawfully joined in marriage." Rev. Sts. *c.* 75, § 24.

The object of this section, as declared in the Report of the Commissioners who framed it, was to adopt the principle stated in *Milford* v. *Worcester*, that a marriage would be lawful, if solemnized before a justice or minister, although without publication of the banns and without the consent of parents or guardians; and to extend that principle so as to prevent marriages from being invalidated on account of some defect, not known or suspected by either party, in the ordination of the minister or the commission of the justice in whose presence the marriage ceremony was performed. That the Commissioners understood the presence of some person, being or believed to be a magistrate or minister, to be necessary to the validity of every marriage of persons other than Quakers in this Commonwealth, clearly appears by their concluding sentence : " The essence of the contract is the assent of the parties ; and if this assent is formally and solemnly given in the presence of one who is acting as a justice or minister, and who is honestly believed to be qualified as such, it furnishes all the security against fraud and surprise, which the law was designed to provide for."

The existing laws upon the subject are mostly contained in the Gen. Sts. *c.* 106 ; and the only modification since the Rev. Sts. that is worthy of notice is that by which, where the fact of marriage is required to be proved before any court, evidence of the admission of that fact by the defendant, or of general repute, or of cohabitation as married persons, or any other circumstantial or presumptive evidence, is made competent. Sts. 1840, *c.* 84 ; 1841, *c.* 20. Gen. Sts. *c.* 106, § 22. Evidence of the kind here mentioned is simply made competent, not controlling when the whole truth appears.

Under all changes in the form of the statutes it has always been assumed in this Commonwealth, and in the State of Maine, which was originally a part thereof, that (except in the single case of Quakers or Friends, whose marriages are made valid by a special provision limited to that sect, and, though not solemnized by any magistrate or minister, are witnessed, recorded and

returned by the principal officer of the meeting at which the ceremony is performed) a marriage which is shown not to have been solemnized before any third person, acting or believed by either of the parties to be acting as a magistrate or minister, is not lawful or valid for any purpose. *Medway* v. *Needham*, 16 Mass. 157, 159. *Commonwealth* v. *Spooner*, 1 Pick. 235. *Meyers* v. *Pope*, 110 Mass. 314, 316. *Thompson* v. *Thompson*, 114 Mass. 566, 567. St. 1879, *c.* 116. *Brunswick* v. *Litchfield*, 2 Greenl. 28. *Ligonia* v. *Buxton*, 2 Greenl. 102. *State* v. *Hodgskins*, 19 Maine, 155. *State* v. *Bowe*, 61 Maine, 171, 177. See also *Dunbarton* v. *Franklin*, 19 N. H. 257, 266; *Northfield* v. *Plymouth*, 20 Vt. 582, 591; *Goshen* v. *Stonington*, 4 Conn. 209, 219; *Bashaw* v. *State*, 1 Yerger, 177; *Denison* v. *Denison*, 35 Md. 361.

It is proper, however, to notice more particularly the Massachusetts cases on which the defendant's counsel relied.

The case decided by the Superior Court of Judicature of the Province in 1758, and cited in Quincy's Reports, 29, note, appears by the record, there referred to, to have been as follows : Flora, a negro woman, was indicted on the Prov. St. of 1696 (8 W. III.) *c.* 11, "to prevent the destroying and murdering of bastard children," which had this preamble: "Whereas many lewd women that have been delivered of bastard children, to avoid their shame and to escape punishment, do secretly bury or conceal the death of their children, and after, if the child be found dead, the said women do allege that the said child was born dead, whereas it falleth out sometimes (though hardly it is to be proved) that the said child or children were murdered by the said women their lewd mothers, or by their assent or procurement," and which therefore enacted that any woman who should be delivered of a child " which, if it were born alive, should by law be a bastard," and endeavor to conceal the death thereof, whether it were born alive or not, should suffer death as in case of murder, unless she could prove that the child was born dead. 1 Prov. Laws, 255. Anc. Chart. 293. The indictment alleged, in the usual form of an indictment for murder, that the defendant threw her child alive into a vault and immerged it in the water and excrements therein, and thereby drowned and suffocated it. The jury, by special verdict, found " that the said Flora is and from her nativity has been a negro slave ; that she was never

married according to any of the forms prescribed by the laws of this land, but that the person supposed to be the father of the said child was also a slave, and had kept her company with her master's consent for above a year and a half before that she was delivered alone of the female child mentioned in the indictment, and thrust the same child into the vault and under the excrements and water, and that the same child was taken out dead therefrom, and that, by means of her so immerging the said child and concealing the death thereof, it cannot be known whether the said child was born dead or alive; " and the jury found the defendant guilty or not guilty, according to the opinion of the court upon the question whether " the said female child, had it been born alive, would have been a bastard, within the meaning and design of " the statute on which the indictment was founded. " After mature advisement upon the said verdict, the court are of opinion that the said Flora is not guilty." *Flora's case*, Rec. 1758, fol. 295. We have no report of the grounds of that opinion; but it may well be that the court thought that so highly penal a statute, changing the ordinary rule as to burden of proof in criminal cases, should be strictly construed, and that the case was not within the evil which it was intended to prevent, as expressed in the preamble.

In *Parton* v. *Hervey*, 1 Gray, 119, it was decided, 1st, that the age of consent in this Commonwealth, as by the common law of England, was fourteen in males and twelve in females; and 2d, that the Prov. St. of 1695–6 (7 W. III.) *c.* 2, the Sts. of 1786, *c.* 3, and 1834, *c.* 177, and the Rev. Sts. *c.* 75, §§ 15, 19, prohibiting justices and ministers, under a penalty, from solemnizing marriages of males under twenty-one or of females under eighteen, without the consent of their parents or guardians, did not make void the marriage of a girl thirteen years old, solemnized by a justice or minister without such consent. The decision on the first point finds additional and conclusive support in the Prov. St. of 1694–5 (6 W. & M.) *c.* 5, § 5, which defined the age of consent to be in " the man fourteen years of age, the woman twelve." 1 Prov. Laws, 172. Anc. Chart. 278. 2 Dane Ab. 301. The decision on the second point was in exact accordance with the statement of Chief Justice Parsons in *Milford* v. *Worcester*, referred to in the Commissioners' Report on the Re-

vised Statutes, as already mentioned, that "when a justice or minister shall solemnize a marriage between parties who may lawfully marry, although without publication of the banns of marriage, and without the consent of the parents or guardians, such marriage would unquestionably be lawful, although the officer would incur the penalty of fifty pounds for a breach of his duty." 7 Mass. 54, 55. The general statement of Mr. Justice Bigelow in the course of his discussion of this point — that, " in the absence of any provision declaring marriages, n>t celebrated in the prescribed manner, or between parties of certain ages, absolutely void, it is held that all marriages, regularly made according to the common law, are valid and binding, although had in violation of the specific regulations imposed by statute" — evidently had regard to the effect of specific regulations as to the publication of banns or the consent of parents, and not to the broader question, which was not before him; whether any presence of a third person was necessary. If the learned judge had intended to cast any doubt on the adjudication of that question in *Milford* v. *Worcester*, he would hardly have referred, as he did, to that case as supporting his statement. 1 Gray, 122.

In *Meyers* v. *Pope*, 110 Mass. 314, there was evidence that the parties went before a person whom they supposed to be a justice of the peace of the county, with the intent on the part of both to contract marriage before him ; that in his presence and hearing the man said that the woman was his wife ; and that they afterwards cohabited together, believing themselves to have been then and thereby lawfully married. The·extent of the decision, as stated by Chief Justice Chapman, was that the provision of the Rev. Sts. *c.* 75, § 24, and the Gen. Sts. *c.* 106, § 20, already quoted, (by which the law as declared in *Milford* v. *Worcester*, had been so far modified as to make a marriage before a justice or minister, believed by either of the parties to be authorized, as valid as if he were in fact authorized to solemnize the marriage,) should by a liberal construction be held to include a case " where the parties go before a magistrate or minister, make a marriage contract in some form in his presence, in the belief that he sanctions and assents to it in his official capacity, and cohabit as husband and wife afterwards, believing that they are legally

married, though the magistrate understands the matter differ-
ently, and does not intend to act officially in the matter." 110
Mass. 316.

The presence of a person officiating, or at least believed to be
officiating, as a justice or minister being (except in the case of
Quakers) clearly required, according to a long course of legisla-
tive action and of judicial opinion, to constitute a valid marriage
in this Commonwealth, it would be superfluous to examine the
English decisions, or the cases cited at the argument showing
that a different rule prevails in some other parts of the Union.
Whether it is wise and expedient so to change the law of Massa-
chusetts as to allow an act, which so deeply affects the relations
and the rights of the contracting parties and their offspring, to
become binding in law by the mere private contract of the par-
ties, without going before any one as a magistrate or minister,
is a matter for legislative, and not for judicial consideration.

In the case before us, it appearing from the undisputed facts
that, in the ceremony performed by the defendant and the woman
with whom he has since cohabited, no third person participated
or was understood or expected to participate in any way, and no
civil magistrate or minister of the gospel, nor any person believed
to be such, was present, and neither party was a Friend or
Quaker, it was rightly ruled in the Superior Court that no lawful
or valid marriage between the parties had taken place.

But it does not follow that the conviction was warranted by
the evidence before the jury. *Milford* v. *Worcester*, 7 Mass. 57.
Sedgwick, J., in *Mangue* v. *Mangue*, 1 Mass. 240, 242. To sup-
port an indictment against a man for adultery, it is sufficient to
prove sexual connection between him and the wife of another
man. *Commonwealth* v. *Elwell*, 2 Met. 190. To support an in-
dictment for bigamy or polygamy, it is sufficient to prove that
the defendant, being at the time lawfully married to one person,
has married another. *Commonwealth* v. *Mash*, 7 Met. 472. *Rey-
nolds* v. *United States*, 98 U. S. 145. But to support this indict-
ment on the Gen. Sts. *c.* 165, § 6, it is necessary to prove not
only that a man and a woman, " not being married to each other,"
" cohabited together," but that they so cohabited " lewdly and
lasciviously," — implying an evil intent, which cannot be inferred
from the mere fact (such as was proved at the trial) of cohabita-

tion under an honest, though mistaken, belief that the parties were lawfully married to each other. *Commonwealth* v. *Hunt*, 4 Cush. 49. If there were evidence that the cohabitation was under such circumstances as to create a common scandal, or tend to corrupt the public morals, the case might be different. See *Commonwealth* v. *Calef*, 10 Mass. 153; *Grisham* v. *State*, 2 Yerger, 589; *State* v. *Moore*, 1 Swan, 136.   *Verdict set aside.*