# COURT OF OYER AND TERMINER,

STATE *v.* WILLIAMS.

*Homicide—Jury—Relationship to Victim—New Trial.*

One of the jurors on a trial for murder being a second cousin by blood of the victim, with the killing of whom the prisoner is charged, neither the prisoner, the attorneys, nor even the juror himself being possessed of this knowledge till after the verdict of guilty,—inquiry generally as to the suitableness of the juror being made in due time, though failing to elicit this fact,—is a sufficient ground for setting aside the verdict and granting a new trial.

By the common law, any one related by blood or marriage to a party in a civil trial, even as remotely as the ninth degree, is subject to challenge on account of the likelihood or suspicion of bias or prejudice, and no evidence to the contrary will be heard, the fact constituting disqualification. By constitution in criminal cases, treating the victim in the light of a party, an impartial trial, in contemplation of law, cannot be had when such kinship exists.

We are bound by such parts only of the common law and its statutory affinities as concerns our condition and circumstances.

The fact that motions for new trials in capital cases have been allowed to be made at all, and seriously entertained, as they have been in this State, affords a sufficient presumption that the Court believed it to be in their power to adjudicate upon them; which power the Court of Oyer and Terminer in this State has.

The Court in which a trial was had of a party who was wrongfully convicted by reason of anything occurring upon the trial can, upon reasonable application, review the evidential features of the trial, and set aside a verdict for any cause that would avail in a civil case, where motion for a new trial should be made.

A prisoner whose life is at stake upon a trial should not be held to the same degree of diligence as to inquiry with respect to the qualifications of jurors as a party in a civil case.

A prisoner's counsel, who was assigned to him by the Court under the authority of the statute, is a sort of substitute for the Court itself, and his omissions should be reviewed by the Court, in the exercise of its discretion in granting or refusing new trials, more favorably than if he had been employed by the prisoner himself for his defense.

In passing upon a motion for a new trial in the case of murder, the person slain ought to be treated as a party in the proceedings.

(*New Castle, January 15, 1890.*)

INDICTMENT for murder.

Motion for new trial.

*Atty. Gen. Biggs* and *Deputy Atty. Gen. Davis*, for the State

*Conrad & Hilles*, for defendant :

At the trial of the case COMEGYS, C. J., charged the jury as follows :

*Gentleman of the Jury:* This case has been well presented and argued by the counsel for the prisoner, as well as by the Attorney General, and now remains to be treated by the Court. When our instruction as to the law applying to it, with some remarks with respect to the evidence, shall be given and made to you, it will be delivered to you for your decision—which from the patient attention you have paid to it in every step of its three days' progress, will, we doubt not, be as just as we are sure it will be impartial and unprejudiced. And we also feel sure that not one of you will allow himself for an instant to entertain the least thought that the prisoner is not entitled to the same fairness of trial at your hands, and the same consideration in all respects, that any man of your own color would be, if he, instead of this colored man, George H. Williams, were on trial for the murder charged in the indictment. After a

thirteen years' service in our criminal courts, I think I can say, without any hesitation or qualification, that I can recall no case where I thought at the time of the trial, or now think, that any injustice by a jury had been done to a negro charged with crime. Our people boast, and justifiably, that the penalties denounced by the criminal laws, are inflicted upon all equally who are guilty of their violation, when arraigned therefor at the bar of the Court.

On the 13th of June last, between eight and nine o'clock at night, a boy was shot to death at or about the corner of Sixth and Monroe streets of this city, and another boy was wounded in the shoulder by another shot fired by the person who was the assailant in the other case—both shots being fired before the assassin's arm was lowered. No arrest was immediately made for the person who used the pistol so effectively, fled. At a late hour in the night the prisoner at the bar was arrested by the police authorities; and upon due and proper preliminary inquiry being made, in the manner detailed to you by the witnesses examined for the purpose of proving it, he was in due form committed to the custody of the sheriff upon the charge of having committed the homicide, and to await the result of a prosecution for that offence. At the September Term of the Court of General Sessions of the Peace and Jail Delivery for this county, he was duly indicted by the grand jury of the offence laid in the indictment—which is murder of the first degree. The prisoner, being too poor to employ counsel, the Court by authority of the law, assigned counsel to instruct him how to plead to the indictment, and to defend him upon his trial. How well he has been defended by such counsel and his assistant, all who have attended this trial can bear witness. His plea to the indictment was that he was not guilty of the crime imputed to him, and for trial he appealed to a jury: and you are his triers, you having been selected by him for the purpose, out of a list, or panel, of fifty-four citizens, summoned in due form.

The first question for the jury to decide in this—is the prisoner at the bar, the man who, on that fatal night, killed

Wright with the pistol, at or about Sixth and Monroe streets. If you find that he is, then it will be for you to inquire and decide whether in so doing he was guilty of murder of the first degree, as indicted; or if not, of murder of the second degree, or of manslaughter.  If of any of them, you can convict him under this indictment of such offence as you may find him guilty.   But if the evidence satisfies you that though he killed the deceased with his pistol, yet in so doing he was acting in lawful self-defence, then you should render a verdict of not guilty.   The first inquiry is a question of fact entirely, dependent upon the evidence on both sides laid before you : the others are questions of law and fact both in passing upon which we shall give you the law for your guidance (which is evidence as to it) and leave you to apply it to the testimony of the witnesses.

In support of the affirmative of the first question—whether the prisoner fired the deadly shot, you have the testimony of two witnesses.   Thos. F. Maloney, the boy who was shot in the shoulder by the shot fired immediately after that which struck Wright in the forehead and killed him, who gave in detail in his examination in chief and in cross examination, all the details of his presence with Wright in Monroe street before and at the time of the shooting; the shooting itself, and the declaration that he looked the person in the face, and that he was positive the prisoner was the man who shot.   He stated that he had seen him on the street before; and that just before he fired, he saw the pistol in his right hand and had a drum in his left.   He also said while his examination was in progress, that he and Wright were in the street near the curb stone, looking at the crowd in front of them on the sidewalk, that he saw no stones thrown, and he and Wright did not throw any.   He was at the hall when the prisoner and others were brought up before the Chief of Police (Major Swiggett) for identification, and he testified that he identified him there.

In further support of the identity of the prisoner with the assassin, the Attorney General produced Francis Vincent, a witness

for the State, who swears that he was at Sixth and Monroe streets between 8 and 9 o'clock of the night of the 13th of June last (the date of the homicide) having come to that point down the south side of Sixth; that when there he saw men running past Sixth up Monroe streets; that he passed through a part of the crowd; that he stopped on the south-east corner only for an instant; that he looked down Monroe and saw a crowd between Fifth and Sixth running up the street, and some of them ran up Sixth street; that most of them came back and clustered around a small colored boy on Monroe street near the new house being built; then he started across to the crowd around the boy, and then he saw a colored man come around the south-west corner of Sixth and Monroe out of Sixth street, who, when he got around, pointed a weapon at the crowd and fired two shots, after which he ran off; that when he fired he was facing towards the East with his back to the new house; and that it seemed to him, the revolver was not a foot from the first boy's head, the other boy being immediately behind him. (Maloney in his evidence, stated their position to be as described by witness.) The witness said that the man who did the firing, looked sharp at him; that he could'nt tell whether the prisoner is the man who fired the shot, but he had the liking and the build of the man; he looked like him; he had something in his left hand, but could'nt tell what it was. Upon further question in his direct examination, he said he noticed that the man who shot had on a band uniform, and he expressed himself that, to the best of his judgment he was the man who shot. He further testified in such examination, that he was present at the Hall at the time the prisoner was brought and placed before Maloney, and that at that time he himself recognized him as the man who fired the shot. His cross examination elicited nothing to the contrary of what he stated in chief. .

Charles Reardon, a policeman, arrested the prisoner as he stated in his examination, and he had a kettle drum with him. In his cross-examination he said the prisoner had no firearms on his person; that another man was brought in and he had a revolver.

His name was Perry Cooper, but his revolver was a rusty one. Chief Swiggett also identified the prisoner's kettle drum, and the drum itself was put in evidence. The prisoner himself was, in the course of the testimony, proved to belong to the fife and drum corps on parade that night on Monroe street, the members of which, according to testimony in the case, had been attacked by a crowd of boys and men on Monroe street as the corps were moving along in, with stones and had fled up the street, scattering (using the term of the witnesses) at Sixth and Monroe, and some going one way and some another. It was not proved, however, that the whole corps (about thirteen on parade that night) had dispersed at that point.

Holton B. Yarnall, a witness, produced on the part of the State, swore that at the time the shots at Sixth and Monroe were fired, he was on the inside of his gate about a hundred feet off from the scene; that as well as he could judge, the man who fired was in the middle of the street; that he came when he fired right up past his gate, and had a kettle drum in his hand; couldn't get a view of his face, but he had a kettle drum in one hand and a revolver in the other; that he was middling tall and stout, just such a man in appearance as the prisoner; that he heard two shots. In his cross-examination he stated that his attention was attracted by what he thought was colored men running up Monroe street; repeated that he thought the man who did the shooting was about the middle of the street; that after he passed some other colored people passed; noticed no uniforms and heard no band, and that he heard some one in the crowd repeating give it to him. In reply, he said only two shots were fired.

George Naylor, another witness for the State, in his examination in chief swore that he saw Wright when he was shot; that he ran up Monroe street with the crowd; that at Sixth the crowd was around a little band boy; that some one passed him in band uniform, and that when he got three or four yards beyond him, in front of Wright and Maloney, he fired twice; saw them both fall. When the man shot Wright he was about three or four feet from

him and Malony was right back of Wright; that he didn't know what became of the man, that he had a kettle drum in his left hand something like that (the drum proved). When he shot he (witness) was three or four yards from him; that he didn't get a view of his face, but was about his (the prisoner's who stood up to be seen by witness) size. In his cross-examination he said the man who shot came up Monroe street and stopped and shot.

John J. Ryan, another witness for the State, said when sworn that he was standing between Maloney and the lamp post when he was shot; saw the crowd, and when he got up, some one was holding the band boy right opposite where Wright and Maloney were shot; that all of a sudden saw *this fellow*—(I use his language, supposing, however, he did not mean to indicate the prisoner), coming from towards the street. Didn't get quite to the crowd when he shot; that he had on a band uniforn, and had a kettle-drum in his left hand; that he didn't see his face; he had a cap over his eyes; that he was a man of the make and build of the prisoner.

Charles Glazier, another State's witness, said he was about 75 feet up Sixth street when he herd the shots; first thing he heard was, somebody said, we've got one; sound came from Monroe street; that he went about ten feet and heard two shots; saw a man run across Sixth street; his back was towards witness; looked as if he had a drum in his left hand; that he kept on down to Monroe street and across it; then he went across where the boys were shot; saw the man, the drum man, run across Monroe street, putting omething in his pocket. The prisoner then having been ordered to stand up, the witness said the man was about his size and build.

Chief of Police Swiggett being recalled by the State, repeated the identification of the prisoner by Maloney as the man who shot Wright and himself, and that he did this positively.    ⟩

William Richardson being sworn for the State, stated that he was with the fife and drum corps that night, and then pointed out two men, who, with the prisoner, were the kettle drummers; that he, himself, was at the right of the line—and the kettle drummers

the last in it; that at Fourth and Monroe they broke and ran; that
he ran up Monroe to about Tenth, and then went down to Dela-
ware Avenue; and that he saw Henry Laws at Fourth and Monroe
and that they went side by side to the Avenue; that they seperated
at Tenth and Market; that he had his drum with him; saw no
shot fired, but heard shooting; that Laws and he were at the head
of the crowd, running; that the only person he saw when they sep-
erated, were Laws and Williams; that the only time he saw Wil-
liams was at Fifth street; he was turning up the middle of Fifth
street when we got there, and that he was running; that he couldn't
say whether he was behind us or not; that he was running and had
turned into Fifth street; he was turning in Fifth street.

George Bantum was a kettle drummer, and accounted for him-
self from the time the corps ran up from Fourth and Monroe until
his arrest; he had his drum with him.

Henry Laws gave himself up at the Hall about 2 o'clock in
the morning; he was with Richardson, he said, that night.

This is the evidence offered to identify the prisoner with the
man who killed Wright.

The first witness produced by the defense was Lewis Howes,
but his evidence related to the occurance at Fourth and Monroe
of knocking off a man's hat by one of the fife and drum corps, the
shooting there, the confusion of the corps, its flight up the street
&c. Didn't think there was much disorder in the street at that
time (perhaps the time of the firing at Fourth and Monroe); that
when they passed up there seemed to be confusion; that twenty-
five or thirty people, or more, ran after them; that he saw no dis-
order by any member of the corps before that shooting or after-
wards.

Grant Bantum, already sworn in behalf of the State, traced the
movements of the corps on its progress from Front and Monroe till
it reached Fourth at the merry-go-round, where the crowd being
great it was obstructed, but the crowd divided and the band passed
through; soon it pressed upon the corps, and stones were thrown at

the members by persons in the street—boys and young men—about twenty-five or thirty of them; that the line of the corps was broken, some going into Peregoy's saloon at the northwest corner of Fourth and Monroe; that he opened the door and called them out. (He was business manager of the corps). Williams, the prisoner, was one of them. He told them to come on; they then commenced to go up Monroe street; that he turned out Fifth to Adams; that when he turned to look for the prisoner he was going towards Fifth street across Monroe. He then described his route to Eleventh between French and Walnut, where he says he met the prisoner; that he crossed the street from North to South to him; that he himself had not stopped after he left Fifth and Monroe; that when he saw the prisoner on Eleventh street Nelson Govens and Arthur Wells were with him. Recurring to past occurrances he said they were followed to Fifth and Monroe (I suppose those who came from the saloon upon his call); that the crowd were pretty close upon them when they turned; that most of it was on the west pavement; that up to the time they separated he had shown no pistol; that he had no pistol when he saw him on Eleventh street. I have no note that he said what time it was when he met Williams on Eleventh street.

In his cross-examination he said there were four or five who came out from the saloon; that they started up Monroe street, and broke into a run; that when he saw Williams he had got to the curb at Fifth and Monroe, and was running, and that the persons whom he saw when he met the prisoner on Eleventh street were all of them members of the corps but Arthur Walls.

Arthur Walls was next sworn for the defence. He was not a member of the fife and drum corps, but at the time it reached the merry-go-round at the southwest corner of Fourth and Monroe he was with it, and marching with the prisoner, and was hit on the right arm by a stone; that the prisoner was the last man in the line, and was next to the houses; that the stoning party was in the street—quite a number of them—near as he could say about a hundred

of the stoners; that when the two shots were fired at Fourth and Monroe, he was running in the middle of the square between Fourth and Fifth; had started at the merry-go-round; that he ran up the pavement to Fifth on the west side; at Fifth he crossed to the east side, and came up to Market street; that he saw the prisoner at Fifth and Madison, having turned around when he got there, and saw him coming up from behind as from Fifth and Monroe; that he passed on up two or three squares this side of Monroe; that they then came together to Fifth and French. He then gives an account of their further progress to Ninth and French, where they met Nelson Governs; then they all went to Eleventh, then down to Heald street, where he separated from the others, &c.

Walter Grace being sworn, said he was the drum major of the corps, and was with it at the merry-go-round; that throwing stones caused the band to quit playing; he had heard the stones against the houses before he got to the merry-go-round; when there he saw something like a pipe, or coffee pot and then ran; was about half way above Fourth at that time; that was where he started to run; that he ran up Monroe to Seventh on the west side; heard shots when he was between Sixth and Seventh, that seemed to be back of Fourth; that when he ran up the street, two white men followed him crying catch the son-of-a-bitch, and repeating it; that when he started to run, there were four or five hundred people at Fourth and Monroe. Next saw any member of the corps at Eleventh street bridge; and that he stopped running at Seventh and Monroe.

William Richardson testified to what had occurred in the way of throwing stones, at Fourth and Jackson; that he was one of the party in Peregoy's saloon when they were called out by Bantum; that Bantum said, all of our boys come out of here; that at Fifth and Monroe be saw the prisoner; that he, the witness, was going right up, and saw him right across the street—seemed to be going to strike Fifth; saw him turn into the street, and knows it was he; and that he did'nt see him again that night.

John Banks was a fifer in the corps; was with them at the merry-go-round; remembers the throwing of the stones; when between the merry-go-round and Peregoy's saloon; stones struck his fife twice, once knocked it out of his hand; he then ran up Monroe street to Eighth, and came on in Eighth street; heard the firing when about half way up the square. Saw no member of the corps till he got to Eleventh street bridge; knows there was a sound behind him; somebody cried, catch him, catch him; did'nt see any stones thrown about Fourth and Monroe.

George W. Walker, being sworn for the defence, said he was a member of the corps; that when they got to Third and Monroe, there were white boys and men in the street throwing stones; that he was next to the gutter—Richard Golden marching alongside of him; that he did'nt see anybody hit by stones, but heard them against the house; that he ran up Fourth to cross just above the saloon; that he saw the prisoner turning into Fifth street, he having crossed ahead of witness to the right hand side of the street; that he saw him there; that he saw him afterwards at Eleventh and Pine; and that he heard two shots at Fourth and Monroe after he had got by Peregoy's saloon.

Nelson Govens, a small boy was sworn. He was a fifer in the corps. Did'nt know or not whether he saw stones thrown at Third and Monroe; but did, opposite the merry-go-round; that he ran; that he was then at Peregoy's saloon; that he ran because of the stones; that he ran up Monroe nearly to Sixth, when a man grabbed him, and stooped down to pick up a stone; man said if you don't tell me who fired the shot, I'll knock your head off; then a man came through the crowd and said, don't hurt him, he's too small; he did'nt fire the shot; that he then ran up Monroe as far as Ninth; that he heard the shots at Fourth, and also at Sixth; was close to Seventh, when he heard the last shots; that the crowd that had hold of him came on up the street; that he went straight out Ninth to French street, where he met Arthur Walls and the prisoner. Went with them up Eleventh to French.

Richard Govens, another small boy, said on his oath, that he was going up Monroe street, when the first two shots were fired; did'nt think he had got to Fifth; that he ran, and the first member of the corps he saw afterwards was the prisoner at Eleventh; that he, the witness, was then on the other side of Walnut.

Mrs. Ellen Mounck was then sworn, and said that she was in her front room on the night of the tragedy at the corner of Sixth and Monroe, she residing at 526 of the latter street; that her attention was attracted by a large crowd of men and boys coming up the street; that she opened the window and saw what was the matter; heard the boys holler—catch him, catch him, the son-of-a-bitch. Saw the crowd over the party, don't know who it was; they seemed to catch up with him; when they got nearly up with him he turned and fired. Saw two flashes, heard two reports, saw the two parties fall. I thought then the crowd was running after some one. The man that did the shooting had got to Sixth street, and seemed to be going up it; the crowd was all around him grabbing at him, and seemed to be about to catch him when he turned and fired; they seemed to be about to fight and quarrel; that the man who shot turned around and faced the crowd when he fired; crowd was just right at the corner, just at the new house; that she could'nt tell whether the man who was chased did the shooting. She saw his hand raised.

Upon the cross examination she stated, that when she raised the window the crowd seemed to be going up the middle of Monroe street; after it had dispersed saw a man in uniform; that she could'nt see from the distance she was at, whether the persons shot were men, or boys; saw the crowd with their hands raised up, it appearing to her as if they were going to have a regular fight; there was a great deal of noise and confusion; saw a hand raised to fire; can't tell whose it was; couldn't say the man who fired the shot was the man they were after; didn't see him till just as he fired; couldn't tell whether he was white or black; he was on the pavement when he fired. As soon as he fired she went in the hall and locked the door.

Andrew Winckleman, was next sworn, and said he lived at 805 West sixth, the third house from Monroe on the north side; that he was on his front steps at the time of the affair, and that the first thing that attracted his attention was a shot fired, but not at Sixth and Monroe. Before that he heard the music of the drum corps, which ceased after the shot; then heard rushing up Monroe street from Fourth or Fifth towards Sixth. Saw the crowd on the south-west corner of Sixth and Monroe; some came around the corner and ran up Sixth street hill; it continued on up the street as if flying from danger. Before that the shots were fired at Sixth and Monroe, a few feet below the lamp post; that he didn't see the man who shot; but saw the flash, and heard the report; didn't see whether he was white or black; that there was quite a crowd there; that the flash seemed to be toward him; that there were about twenty-five people in the crowd from what he saw; he thought the majority of the crowd fled up Sixth street hill; saw young men with band suits running up Sixth street, with the crowd; while he was at his house, didn't see any one pass by the front of the new house, and go around the corner; saw part of the crowd pass at Monroe street, some in band uniform; one had a drum, he seemed to continue on up Monroe; before the shooting heard the crowd say, shoot the son-of-a-bitch, catch the son-of-a-bitch; he then went down to the corner, but not in time to see the shooting.

Wm. A. Cole was next examined, and said he lived on Sixth the second house from Monroe, that at the time, he was sitting on his front steps. Heard the first shots down Monroe street: saw a crowd coming up Monroe street whooping and hallooing from toward Fifth: most of it seemed to be in the street; seemed apparently to be in pursuit of some one, whoops and halloos: that he didn't see them after that: that the crowd seemed to stop about the corner, as though they had something surrounded: shortly after, he supposed ten minutes, saw two shots fired: didn't see the man that fired, may have seen him afterwards but not know him. Im-

mediately after the shots, saw the crowd disperse to the east side of Monroe. Before the shot fired heard some one say, catch him; heard some one say—there's some one in the cellar. Upon his cross examination he said he saw the flash of the pistol, and immediately after the crowd got to the east side of Monroe street, saw a man cross over Sixth going up Monroe: apparently he went from where the shots were fired: in one hand he had a kettle drum, but didn't know in which hand.

Charles E. Evans, swore that he arrested the prisoner between 9 and 10 o'clock the night of the shooting, on Fourteenth street between Heald and Claymont streets: that Bantum and Cooper were present and arrested also: that the prisoner himself showed no disposition to resist: that about five minutes before he saw him going from Eleventh and Church over Eleventh street bridge.

The defence here closed and State produced Chief of Police Swiggett, in regard to the testimony produced by the defence that the prisoner left Monroe street at Fifth street, and went with the witnesses out that street across the city to the place of his arrest—that the prisoner admitted to him at the City Hall that he left Monroe at Eighth street.

I have now, gentlemen, at great length rehearsed before you the prominent facts, and all that seemed to me important, testified to on both sides—using, so far as my notes taken at the time the witnesses were examined enabled me to do so, their language on both sides; and it is for you to examine and weigh it in your minds, with prudent, caution and scrunity, to enable yourselves to intelligently and satisfactorily decide this case. I forbear to comment upon that testimony; but prefer to leave it to be judged of entirely by your own minds rather than by any word of mine from which a conclusion might be drawn favorable or unfavorable to the State or to the prisoner.

Bearing in mind gentlemen the humane as well as sensible rule which you have already heard from the prisoner's counsel and which I now repeat—that every man is presumed to be innocent of

crime until he is proved, by satisfactory proof, to be guilty; if you
believe by that before you in this case, beyond a reasonable doubt,
that the prisoner is the man who killed the boy Wright on the 13th
of June last, you must then decide, according to the nature of the
instructions the Court has been asked to give you, whether he was
acting in defence of his own person when he did so. If you find
that he was, he is guilty of no crime and is entitled to acquittal at
your hands. If you do not think he was so acting, then he is
criminally guilty of one of three crimes, depending upon the nature
of the evidence against and for him—murder of the first degree,
murder of the second degree or manslaughter. In order that you
may be able to intelligently decide which, in case you think there
is guilt, I must tell you what those crimes are; and as the State has
charged the prisoner, by the indictment with the highest of them,
murder in the first degree, it is proper I should begin with that.
Murder of the first degree, briefly, is where one man intentionally
kills another with malice preconceived. Malice is wickedness;
therefore where a man slays another from a wicked motive, existing
though but a moment before the act is done, it is murder of the
first degree; because it is what the law denominates a predetermined,
malicious homicide. Where the circumstances of the killing are
such as to show the preconceived intent to do it, as by the deliber-
ate use, for example, of a deadly weapon, there is what the law
calls express malice, and the crime, is as I have said, murder in
the first degree. Where, however, the circumstances of the case are
such that a preconceived, deliberate intention to kill is not proved,
and yet the death has been caused by the deliberate, cruel
act of the accused, of such a nature that no other inference can
arise than that it was with wickedness, it is alike malicious and
murderous, though by our statute it is murder of the second de-
gree, and not of the first. In the latter case, the malice is an in-
ference of the law from the facts found by the jury; in the former
the malice is express by the proof of actual design. No killing
can be murder of the first degree unless it be shown to be de-

signedly done, from a wicked heart, and deliberation. Anytime is long enough for deliberation, if a wicked act result from it, though there may have been no malice before. Where there is no malice in the act of killing, either express or implied, but the homicide is upon a sudden heat or transport of passion, caused by some offence of a character that it is beyond human nature to bear, the law, out of tender regard for the feelings of men, adjudge the crime to be manslaughter only ; but does not excuse it by any means, awarding to it adequate punishment. Killing a man in self defence is no crime in law ; but before the plea can avail, it must appear that the slayer was hard pressed by his adversary, and had no other means of saving his own life, or protecting himself against great bodily harm. But the burden of proof is on him to show that ; for every killing with a deadly weapon is presumed in law to be malicious and murder, unless the contrary is shown by proof on behalf of the slayer.

I think now, gentleman, I have said enough about the law of homicide, to enable you to decide what the degree, or grade of crime is of which the prisoner is guilty, if the evidence requires you to find he is guilty of any. And as requested by his counsel, I say to you, as the organ of the Court, that if you think, from the proof, that he fired the fatal shot under such circumstances as shown that he was so transported by adequate provocation as to have lost control of his passion and that in aiming at those who caused the provocation, he unfortunately killed the boy Wright, he is but guity of manslaughter; and that if he killed him by accident when he was in the just defence of his life or person from great bodily harm, having no other means of doing so than to endeavor to kill his actual adversary, he is guilty of no crime—the death being in law accidental—as being done while he who caused it was in the lawful act of self-defence.

Finally—of none of the grades of homicide I have explained to you can the prisoner be properly convicted, unless after fully considering the testimony on both sides, the character of the witnesses, their likelihood of having the knowledge they swear to, and

the proved circumstances which make for or against guilt or inno-
cence, your minds are free and clear of all reasonable and just
doubt, that he is guilty of that one.   The presumption of innocence
which is the shield with which the law protects every man, must be
entirely overcome with proof altogether satisfactory to the jury,
before a conviction of crime can properly be supported in any case.

On motion for new trial.

COMEGYS, C. J., delivered the opinion of the Court:

The chief ground relied upon in the argument upon the
rule in this case to show cause why the verdict should
not be set aside, and a new trial granted the prisoner, is that
William C. Lynam, one of the jurors who tried the indictment
against the prisoner, was a relative of the boy Wright who was
killed, viz., a second cousin by blood.   According to the statement
of the prisoner's counsel, which statement was accepted by the
attorney general as true, neither the prisoner nor they had any
knowledge of that fact until after the verdict was rendered.   The
other grounds are the usual ones in motions for new trial, and are
not relied upon by them.   In the argument presented by such
counsel, they discussed the preliminary question of the power of
the Court to grant a new trial in a capital case, as well as the prin-
cipal one aforesaid.   The attorney general answered the prisoner's
counsel by contending—*First.*   That the Court of Oyer and Ter-
miner in this State had never yet granted a new trial in a capital
case, and that to do so would be repugnant to the common law in
the case of felonious crimes; and that, with respect to the reason
given for setting aside the verdict for a new trial, that the juror
Lynam was related by consanguinity to the alleged victim of the
prisoner,—that is, that he, the deceased, was a son of a first cousin
of the juror,—the common-law rule of disqualification of a juror
on the ground of kinship does not apply to a relationship between
the party slain and a juror, but only to a juror and a party to the
trial; and that the subject of a homicide is not a party to the in-
dictment upon which a prisoner is to be tried.   And, *secondly,* that,

if this point should be ruled against him, still the objection to the juror Lynam should not now be entertained, as it could have been developed before the trial began, if the prisoner's counsel had made due inquiry to ascertain the fact whether kinship existed or not. In the remarks made by the learned counsel for the prisoner who opened the debate on the motion he stated that inquiry, generally, with respect to Mr. Lynam's suitableness as a juror, was made in due time, but he could not state that any inquiry as to relationship was made.    Such inquiry as was made, was of William T. Lynam, a member of this bar, who is a brother of the juror Lynam, and conversant with the law on the subject of the qualification of jurors. The fact that he did not mention the relationship can be understood in no other way than that he either did not know of it at the time, or that the inqury itself did not recall his recollection of it, which may have faded, as is not infrequently the case where the place in life of kindred happens to be dissimilar.    We must think that the inquiry undertaken by the counsel for the prisoner was with a view of finding out, if it might be, every possible ground of objection to a juror, so that the prisoner might be prepared to challenge him, if exceptionable, when he came to the book.

By the common law (and we have no statute on the subject) any one related by blood or marriage, as remotely as the ninth degree even, to a party in a trial, is subject to challenge *propter affectum*,—that is, on account of the likelihood or suspicion of bias or prejudice,—and no evidence to the contrary will be heard.    The fact constitutes disqualification.    It is evident, therefore, that an impartial trial, in contempletion of law in civil cases, cannot be had where such kinship exists, nor by the constitution in criminal cases, treating the victim as in the light of a party.

Although it is true that there is no reported case of a new trial having been granted in this State in a capital case, yet it is none the less true that motions for new trials in such cases have been made from time to time ; and, so far as there is any evidence or knowledge upon the subject, they have never been refused on

the ground of want of power to grant them. The fact that such motions were allowed to be made at all, and seriously entertained, as they have been, affords a presumption, which would seem to be altogether sufficient, that the court believed their power in such cases extended that far. It is not the practice of this court, or of any other in this State, to entertain a proceeding of any kind which it would be beyond its power to adjudicate upon. While the great body of the English common law is in force here, yet it is because it, and such statute law as is virtually a part of it, are suited to our condition and circumstances. We are an English-speaking people, descendants, for by far the most part of us, of English ancestry, and as much inheritors, therefore, of the grand system of law by which they were governed, as are the subjects of Great Britain; but we are not, as they, bound by every part of the common law, but, as has been said, by such part of it and its statutory affinities as concerns our condition and circumstances. In a free government, such as our own, and that of the mother country as well, the object of all law, common or statutory, is the establishment and enforcement of "justice,"—that comprehensive term in which are included the three great objects for which, according to our declaration of independence, governments among men are instituted. Whatever rule of the unwritten law, therefore, is at variance with this great purpose of justice,—the security of life, liberty, and the pursuit of happiness,—is one not suited to our condition and circumstances; we having entered upon and hitherto pursued with entire satisfaction and success a career of government for ourselves which admits of no injustice to any individual, however circumstanced or humble in social rank he may be. There is, it is true, in England no new trial in a capital felony by the common law; but there is, in practice, which is a part of it, a remedy for a verdict which should not have been rendered,—a respite of execution upon the judgment following it until appeal can be made, through the proper channels, to the sovereign, for pardon or commutation of the sentence. This appeal, made at the instance of

the court in which the prisoner is tried, has never gone unheeded, and never will be unfavorably recognized. Whenever the tribunal which receives a verdict of guilty in a case involving life suspends its order for execution on the ground of a wrong verdict or otherwise, relief against it follows as a matter of course. It is part of the common law, as administered in England, that it should be so. There is now, in England, a "court for crown cases reserved," as it is called, which entertains cases certified to it by the trial court, and for proper cause affirms or quashes convictions.

Our ancestors did not bring with them here the practice or feature of the trial of capital crimes with respect to applications for pardons. The governors of the states have the power of pardon under the constitutions of their several communities. They may pardon wherever they choose, unless restrained therein; but it has never been supposed that they would feel themselves in any sense bound to yield to the suggestions of the judges who try criminals, as is done in England. This being the case, a party wrongfully convicted on any account, by reason of anything occurring upon the trial,—for example, the wrongful admission or rejection of testimony or evidence offered; the allowance or disallowance of challenge; refusal to charge the jury upon an essential point, or misdirection in a charge, etc.,—would be entirely without any relief, so far as we have any practice that would avail him like that before stated prevailing in England, unless the court in which his trial was had could, upon seasonable application, review the evidential features of the trial and its own rulings, and set aside a verdict founded upon improper evidence, the rejection of proper proof; the refusal or allowance of challenge, false or mistaken ruling, and any other causes that would avail in a trial between party and party where motion for a new trial should be made. To turn a deaf ear to an appeal for a new trial in a capital case, on grounds *prima facie* good if set forth in an application in a civil case, would be to repudiate justice, not only as the object and purpose of civil government for which chartered guaranties exist, but also

the principle of right itself, which has higher sanction than any constitution of statute of government. It is impossible that anything can be said against a second trial of a man convicted of a capital felony, where it is evident that, as such applications are considered in civil cases, it would be unjust to deny it. We might, and perhaps should, deny an application like this, if this court had always refused to entertain such a one on the ground of want of power ; but as it has not so done, so far as we are informed, at any time in its prior history, although applications such as here have been made, we must conclue that the reason for refusing new trials was because the grounds set forth in the application were not sufficient to justify the court in suspending its sentence. It cannot be doubted that if the crown, in the case of a convict like this, in England, should not respond to the recommendation of the trial court for application to it for pardon, the active spirit of enlightened justice for which the English courts have, since tyranny ceased there, been particularly distinguished, would compel them at once to get rid of the rule against new trials; and they would do it with the same ease that in these times they overrule decisions made long before and acted upon afterwards, on the ground of their repugnance to reason, and in the interest of right.

Nor do we think a prisoner should be held to the same degree of diligence as to inquiry with respect to the qualifications of jurors as a party in a civil cause, for the plain reason that his life is at stake upon a trial, whereas it is only the property of a party in a civil suit that is affected by the result. And another reason why a new trial upon the chief ground should be granted is this : that, the prisoner being too poor to employ counsel, the court, under authority of the statute, assigned counsel for him, to whom the conduct of his defense was committed. By the common law, prisoners indicted for felonious crimes were not allowed counsel before juries, but only before the court on questions of law, the judge taking upon himself theoretically the management of his defense in court during the progress of the trial. Here the court

have power to assign counsel to perform the service they would otherwise feel bound to take upon themselves. He is thus a sort of substitute for themselves, and his omissions should be viewed by the court, in the exercise of its discretion in granting or refusing new trials, more favorably than if he had been employed by the prisoner himself for his defense.

These views influence us to regard with approval the motion in this case for a new trial on the ground of the relationship of the juror Lynam to the unfortunate boy slain. And we have no difficulty whatever in deciding for a new trial, in the face of the objection of the attorney general that exception to the juror is not properly entertainable here, on account of the relation of individual party and party existing in a criminal case because the opportunity offered to a blood kinsman of a party killed by another unlawfully (he being a juror upon the alleged slayer's trial) to be revenged for the crime committed upon his kinsman would be a temptation that would disqualify most men to view the evidence, *pro* and *con*, with any reasonable degree of fairness and impartiality, and might constrain him to find a verdict of guilty. In passing upon such a question as this the person slain ought to be treated as a party to the proceeding. Our judgment therefore is that the rule to show cause be made absolute, that the verdict be set aside, and a new trial granted, upon the ground of the relationship of the juror Lynam to Wright, the party with the killing of whom the prisoner is charged in the indictment.