WILMINGTON TRUST COMPANY, a corporation of the State of Delaware, Guardian of Thomas J. Goslin, Sarah V. Goslin and Elizabeth F. Goslin, *vs.* FRANCES GOSLIN HENDRIXSON, Administratrix of Paul Goslin, deceased, and FIDELITY AND DEPOSIT COMPANY OF MARYLAND, a corporation of the State of Maryland, GEORGE P. GOSLIN, EDWARD S. GOSLIN, ROBERT M. GOSLIN, MARIAN DAVID and DOROTHY BUCK.

1.  COMMON LAW—COMMON LAW RESPECTING MARRIAGES NOT ADOPTED IN DELAWARE.

In Delaware the common law respecting marriages has never been adopted.

2.  MARRIAGE—SECRET NONCEREMONIAL MARRIAGE VOID.

Under the statutes and history of legislation, a secret and nonceremonial marriage is illegal and void.

3.  MARRIAGE—STATUTORY PROVISION THAT MARRIAGE SHALL NOT BE
    AFFECTED BY FAILURE TO TAKE OUT A LICENSE CONSTRUED.

The provision of *Rev. Code* 1915, § 3000, that a common-law or other mar-
riage otherwise lawful shall not be affected by failure to take out a license,
means that if a marriage has been performed in compliance with the laws of
the state in all other respects it will not be held invalid because of failure to
take out a license therefor.

*(January* 1, 1921)

CONRAD and HEISEL, J. J., sitting.

*Aaron Finger* for plaintiffs.

*Richard S. Rodney* and *Charles C. Keedy* (James I. Boyce for
Frances Goslin Hendrixson, administratrix of Paul Goslin, and Philip
L. Garrett for Fidelity and Deposit Company of Maryland) for
defendants.

Superior Court for New Castle County, January Term, 1921.

ASSUMPSIT, No. 162, January Term, 1921.

Amicable action by the Wilmington Trust Company against
Frances Goslin Hendrixson, administratrix of Paul Goslin, and
others.  Facts agreed and case certified to court in Banc.  Judg-
ment for defendants.

This was an amicable action in assumpsit, and it concerned
the distributive balance in the hands of Frances Goslin Hendrix-
son, the administratrix of Paul Goslin, deceased.

The question before the court on the agreed statement of
facts arose from the fact that Paul Goslin and Frances Goslin
Hendrixson were never united in marriage conformably to the
statute regulating marriage in this state, it being contended that
the said Frances Goslin Hendrixson was the common-law wife of
Paul Goslin.

The facts agreed upon by and between the parties were as
follows:

And now, to wit, this thirtieth day of December A. D. 1920, it is agreed
by and between Aaron Finger, Esq., attorney for the plaintiff, James I. Boyce,
Esq., attorney for Frances Goslin Hendrixson, the administratrix of Paul
Goslin, Philip L. Garrett, Esq., attorney for Fidelity & Deposit Company of
Maryland, and Richard S. Rodney and Charles C. Keedy, Esqs., attorneys
for George P. Goslin, Edward S. Goslin, Robert M. Goslin, Marian David,
and Dorothy Buck, all defendants in the above-stated cause, that the follow-

Statement.

ing case be stated, for the information of the court, in the nature of a special verdict, either party to have the right to sue out a writ of error on the judgment to be entered in the cause.

1.   That Fidelity & Deposit Company of Maryland is the surety upon the administration bond of Frances Goslin Hendrixson, administratrix of Paul Goslin, and that George P. Goslin, Edward S. Goslin, Robert M. Goslin, Marian David and Dorothy Buck are the heirs at law of Paul Goslin, if it should be determined by the court that th said minors, Thomas J. Goslin, Sarah V. Goslin and Elizabeth F. Goslin were not entitled to a share in the balance remaining in the hands of Frances Goslin Hendrixson, administratrix of Paul Goslin.

2.   It is admitted that the said minors, Thomas J. Goslin, Sarah V. Goslin and Elizabeth F. Goslin, are the children of Paul Goslin, deceased, and Frances Goslin Hendrixson, the legality of the claim of said children to be determined upon the following statement of fact:

3.   That the relationship between Paul Goslin and Frances Goslin Hendrixson, the mother of the said Thomas J. Goslin, Sarah V. Goslin and Elizabeth F. Goslin, then Frances Stillwell, began under the following circumstances:

That the said Frances Stillwell was residing with her father in the city of Wilmington, New Castle county and state of Delaware, and that the said Paul Goslin, about the year 1902, had been calling on the said Frances Stillwell. That shortly thereafter the said Frances Stillwell resided with her sister in the city of Philadelphia, state of Pennsylvania. That the said Paul Goslin continued to call upon her. That the said Paul Goslin requested the said Frances Stillwell to return to the city of Wilmington which she did. That thereafter the said Frances Stillwell contemplated leaving Wilmington again, but the said Paul Goslin requested her not to do so, but to permit him to get quarters and to have her go and live with him. The said Frances Stillwell agreed and the said Paul Goslin thereupon obtained quarters in this city and the said Paul Goslin and Frances Stillwell went to live together as man and wife and became known to their relatives, friends and neighbors as man and wife, and the said Frances Stillwell assumed the name of Frances Goslin and was thereafter known by that name. The relations between Paul Goslin and his parents were not friendly at this particular time, but when the first child was born about the year 1905, the mother of the said Paul Goslin then came to the home of the said Paul Goslin and Frances Goslin and thereafter she continued to be known and recognized by the parents of the said Paul Goslin as the wife of Paul Goslin. Subsequently two other children were born to the said Frances Goslin at the home of the parents of the said Paul Goslin in the city of Wilmington. The said Paul Goslin and Frances Goslin were known as husband and wife continuously until a few months before the death of Paul Goslin. Several months or perhaps a year before the death of Paul Goslin the said Paul Goslin and Frances Goslin separated and continued to live apart until the time of the death of Paul Goslin in 1917, except that Paul Goslin regularly from time to time called at the house of the said Frances Goslin to see their children and made his last call about three or four days before his death and in addition, during the time they were separated, the said Paul Goslin referred to said Frances Goslin to strangers as his wife, and on one occasion introduced the said Frances Goslin to an attorney as his wife. A few months before the death of Paul Goslin, the said Paul Goslin was requested by a brother of his to obtain the signature of his wife to some legal document which document was also to be executed by Paul Goslin and the said Paul Goslin then stated to his brother that he had no wife and had never been married, and this was the first knowledge which the said brother of Paul Gos-

lin or any other member of the family ever had known that no ceremonial marriage had been celebrated between the said Paul Goslin and Frances Goslin.

4.   It is admitted that the children mentioned in the foregoing item are Thomas J. Goslin, Sarah V. Goslin and Elizabeth F. Goslin, for which children the Wilmington Trust Company was duly appointed guardian and is the plaintiff in this suit.

5.   It is admitted that the balance in the hands of the administratrix for distribution to the proper parties entitled thereto amounts to $1,284.16.

6.   It is further admitted by and between the parties hereto that if the said three children, Thomas J. Goslin, Sarah V. Goslin and Elizabeth Goslin, are held by the court to be the legal children of the said Paul Goslin and entitled to their shares of the balance of the estate of the said Paul Goslin in the hands of Frances Goslin Hendrixson, his administratrix, that the amount due to said minors is the sum of $856.11. If the court shall be of the opinion that the said Frances Goslin Hendrixson, formerly Frances Goslin, was the legal wife of the said Paul Goslin under the laws of the state of Delaware, and that the children, Thomas J. Goslin, Sarah V. Goslin and Elizabeth F. Goslin, were the legal children of the said Paul Goslin under the laws of the state of Delaware, and entitled to their respective shares of the balance of the fund remaining in the hands of Frances Goslin Hendrixson, administratrix of Paul Goslin, then judgment shall be entered in favor of the plaintiff and against Frances Goslin Hendrixson, administratrix of Paul Goslin, for the sum of $856.11, besides cost of suit; and if the court should be of the opinion that the said Frances Goslin Hendrixson was the legal wife of the said Paul Goslin and entitled to her share of the balance in the said funds remaining in her hands as administratrix of Paul Goslin, that she the said Frances Goslin Hendrixson shall be entitled to the sum of $428.05, but if the court should be of the opinion that the said Frances Goslin Hendrixson was not the legal wife of the said Paul Goslin under the laws of the state of Delaware and not entitled to any share of the funds remaining in the hands of the said administratrix, and that the said minors, Thomas J. Goslin, Sarah V. Goslin and Elizabeth F. Goslin, were not the legal children of the said Paul Goslin under the laws of the state of Delaware and were not entitled to any share in the balance of the estate of the said Paul Goslin in the hands of his administratrix, then judgment shall be entered for George P. Goslin, Edward S. Goslin and Marian David, each for the sum of $321.04, and in favor of Robert M. Goslin and Dorothy Buck, each for the sum of $160.52.

The Superior Court, considering that the question of law raised ought to be heard by the court in banc, did, upon the joint application of the parties, direct the same to be so heard.

Argued before PENNEWILL, C. J., and BOYCE, CONRAD, RICE and HEISEL, Associate Judges.

### ARGUMENT OF COUNSEL FOR PLAINTIFFS.

The agreed statement of facts discloses the existence of a good common-law marriage. *2 Kent*, 87; *1 Black. Com. 433*; *Tiffany's Per. and Dom. Rel. 29*; *1 Bishop on Marr. Div. and Sep.* § 320;

*Estate of McLaughlin*, 4 *Wash.* 570, 30 *Pac.* 651, 16 *L. R. A.* 699; *note* 1915E, *L. R. A.* 60; 1 *Scribner on Dower*, 71 *et seq.*

Statutes providing formalities to be complied with by persons intending matrimony, and providing who shall be authorized to perform marriage ceremonies, etc., are held not to make invalid, informal, or common-law, marriages, unless the statute contains express words making such marriages, or marriages not entered into in accordance with the statute, void. *Meister v. Moore*, 96 *U. S.* 76, 24 *L. Ed.* 826; *Missouri State v. Bittick*, 11 *L. R. A.* 588, 18 *R. C. L.* 397; *Mathewson v. Phœnix Iron Foundry (C. C.)* 20 *Fed.* 281. See note case of *In re Love, L. R. A.* 1915E, 113; *Rev. Code* 1915, § 3000; 27 *Del. Laws*, 778. "Nothing in this chapter contained shall be deemed or taken to render any common law or other marriage, otherwise lawful, invalid by reason of the failure to take out a license as is herein provided."

The American authorities hold uniformly that the right to dower is incident to a common-law marriage. 1 *Scrib. on Dower*, 112; 19 *C. J.* 463, and *note* 84; *Mathewson v. Phœnix Iron Foundry (C. C.)*20 *Fed.* 281; *Lavery v. Hutchinson*, 249 *Ill.* 86, 94 *N. E.* 6, *Ann. Cas.* 1912A, 74; 9 *R. C. L.* 568.

### ARGUMENTS OF COUNSEL FOR DEFENDANTS.

The facts regarding the inception of the alleged marriage relation between Paul Goslin in his lifetime and Frances Goslin Hendrixson are set forth in the agreement. Counsel for the brothers and sister, the heirs at law of Paul Goslin, deceased, opposed to the validity of the alleged marriage, contend as follows:

1. That no common-law marriage is valid in the state of Delaware for the following reasons:

(a) A marriage is not valid at common law without a ceremony.

(b) That even if a marriage was valid at common law without a ceremonial marriage such common law was never adopted as part of the law of this state.

2. That the facts set forth in the agreement do not constitute a marriage good at common law for the following reasons:

(a)   That to create a good common-law marriage there should be an agreement per verba de presenti between the parties by which they agree to be husband and wife.

(b)   That cohabitation is not sufficient to sustain a common-law marriage.

(c)   That general reputation is not sufficient to sustain the validity of a common-law marriage.

1. (a) A marriage is not valid at common law without a ceremony.

The highest court in England says that a nonceremonial marriage was never good at common law. In *Reg. v. Mollis*, 10 *Cl. & Finley* 524, 17 *Eng. Rul. Cas.* 66, the court held that a ceremonial marriage is necessary to sustain its validity. It is admitted that the majority of American jurisdictions hold that a nonceremonial marriage was good at common law, but it is submitted that in these States, the Legislature has not expressly or impliedly revoked the common-law doctrine.

1. (b) That even if a marriage was valid at common law without a ceremonial marriage such common law was never adopted as part of the law of this state.

Only such part of the English common law was adopted at the time of our separation from England as was applicable to the existing circumstances and institutions of our people. *Clawson v. Primrose*, 4 *Del. Ch.* 666. It is contended that the common-law validity of nonceremonial marriages was not applicable to the conditions of our people at the time of the separation by reason of the express and implied statutory provisions governing marriages.

At the time of the grant of Pennsylvania and the three lower counties upon the Delaware to William Penn certain laws were agreed upon in England prior to the coming of Penn. Among these the nineteenth in number was the following:

" That all marriages (not forbidden by the law of God, as to nearness of blood and affinity by marriage) shall be encouraged; but the parents or guardians shall be first consulted, and the marriage shall be published before it be solemnized and it shall be solemnized by taking one another as husband and wife, before credible witnesses, and a certificate of the whole, under the hands of parties and witnesses, shall be brought to the proper registrar of that county, and shall be registered in his office."

· This law remained in full force until the act of 1706 (*Code of 1752, p.* 23.) This act is entitled "An Act for Preventing Clandestine Marriages," and the material portion thereof is as follows:

"For the preventing of clandestine, loose and unseemly proceedings in marriage within this her Majesty's government; be it enacted by the Honorable John Evans,Esq.,with her Majesty's royal approbation Lieutenant Governor of the counties of New Castle, Kent and Sussex upon Delaware and province of Pennsylvania, by and with the advice and consent of the freemen of the said counties, in General Assembly met, and by the authority of the same. That all marriages not forbidden by the law of God, shall be encouraged, but the parents or guardians shall, if conveniently they can, be first consulted with, and the parties clearness of all engagements signified by a certificate from some credible person where they have lived, or do live, produced to such religious societies to which they relate, or to some justice of the peace of the county in which they live, and by their affixing their intentions of marriage at the dwelling house of such justice of the peace as shall subscribe the same, and a true copy thereof affixed at the court house door of the county or counties where the same shall be set up as aforesaid, and shall stand up in each respective county where the parties do reside or dwell, thirty days before solemnization thereof; the which said publication, before it be so affixed as aforesaid, shall be brought before some one or more justices of the peace in the respective counties to which they respectively belong, which justice shall subscribe the said publication, witnessing the time of such declaration, and the date of the said publication to be affixed as aforesaid; and that all marriages solemnized by taking each other for husband and wife before twelve sufficient witnesses and the certificates of their marriage under the hands of the parties and their witnesses, at least twelve, and one of them a justice of the peace, being brought to the register of the county where such persons are married, and registered in his office, such marriage shall be deemed and adjudged legal and authentic."

This act continued in force until June 11, 1788, when it was repealed, and "An Act to Regulate Marriages" prescribed that no rites of marriage shall be celebrated by any person within the state except by a minister or preacher of the gospel.

This act was repealed January 29, 1790, and substituted by *chapter* 211, 2 *Del. Laws*, 972. Under this act, only those marriages were legal which conformed to the statutory requirements.

The next change was made on February 16, 1829, 7 *Del. Laws*, 451. By *section* 5 of this act it was expressly stated that if any person not authorized to solemnize marriage shall pretend to solemnize it the marriage shall be void. If then the marriage shall be void if not solemnized by one authorized to solemnize a marriage it is inconceivable that the marriage would not be void if not solemnized at all.

The next change was in 8 *Del. Laws*, 99, when the mayor of Wilmington was given authority to solemnize marriages. The next material change was inserted in the *Code of* 1852, *p.* 237, wherein it was stated that if any person not authorized to solemnize a marriage shall do so he shall be fined "and such marriage shall be void, unless it be in other respects lawful, and be consummated with the full belief of either of the parties in its validity."

Where both parties might know that the person pretending to solemnize the marriage had no right to do so, the marriage was void and if this be true no common-law marriage with no solemnization at all could be good.

The above identical provision is in the *Code of* 1893, *p.* 593, under which law the present marriage, if any, originated.

The Delaware cases bearing upon the question are, among others, the following:

*Doe ex dem. Jackson v. Collins*, 2 *Houst.* 128; *State v. Miller*, 3 *Pennewill*, 518, 52 *Atl.* 262; *Pettyjohn's Executor v. Pettyjohns*, 1 *Houst.* 332; *State v. Wilson*, 5 *Pennewill*, 77, 62 *Atl.* 227; *Cohen v. Cohen*, 3 *Boyce*, 365, 84 *Atl.* 122.

When the court holds that the state of Delaware has determined "by its laws the manner of the creation of the marriage state," it means the acts of assembly and that a marriage to be valid as originating in this state must have been performed according to the written laws of this state.

In *Petras v. Petras*, 7 *Boyce*, 290, 105 *Atl.* 835, the court held valid for purposes of divorce a common-law marriage having originated in New York, but expressly stated:

"This does not mean that the court would recognize a common-law marriage claimed to have been consummated in this state."

In *State v. Oakes*, 1 *Boyce*, 576, 76 *Atl.* 480, and in *State v. Adams*, 2 *Boyce*, 588, 83 *Atl.* 936, the court held that cohabitation might be used as proof of a pre-existing marriage, and that a man having cohabited with a woman and holding her out as his wife, though not in fact married, would not be permitted to deny or disprove the relation in order to evade the civil liability such as nonsupport.

See also *Claim No.* 1564 of the Industrial Accident Board (*Digest, page* 7); the Board holding that a common-law marriage was not valid in Delaware.

2. (a) That to create a good common-law marriage there should be an agreement per verba de præsenti between the parties by which they agree to be husband and wife.

In almost all of the American jurisdictions which support the doctrine of common law it is almost uniformly held that they can only be supported by reason of per verba de præsenti and that the doctrine of per verba de futuro has been almost entirely discarded. The marriage relation to be valid at all under the doctrine of per verba de præsenti must have originated before cohabitation, since cohabitation follows as an incident of the marriage relation.

In the agreed statement of facts there is nothing to indicate the relationship forming a valid marriage, but only a request and consent to "go and live with him" and subsequent cohabitation. Some of these states and jurisdictions which support a marriage per verba de præsenti hold that the marriage is valid without subsequent cohabitation, but in no state or jurisdiction so far as counsel is aware has cohabitation or general reputation formed a basis of a marriage.

Leave was granted to file supplemental briefs.

SUPPLEMENTAL BRIEF FOR PLAINTIFFS.

Under heading 1 (b) of defendants' brief, it is contended:

(b)   "That even if a marriage were valid at common law without a ceremonial marriage such common law was never adopted as part of the law of this state."

The various early acts referred to by counsel for defendants are not material, for the reason that they had been repealed and substituted by the statute in relation to marriage contained in the *Code* of 1893, which was in force at the time the marriage in question was consummated.

In *Mathewson v. Phœnix Iron Foundry (C. C.)* 20 *Fed.* 284, it was contended, as in this case, that common-law marriages were

never considered valid in Rhode Island. As in this state, the question had never been passed upon by the Rhode Island courts, but the argument was based upon the history of legislation in Rhode Island on the subject, and particularly upon the older statutes. Rhode Island had various statutes "for preventing clandestine marriages," the earliest having been ·passed at the first session of the General Assembly ever held in Rhode Island, in 1647. Incidentally this statute differed from all the Delaware statutes cited, in that the same expressly provided that no marriages should be held lawful except those contracted according to the form of the statute.

None of the Delaware cases cited for the defendants on this point touch the question of marriage, or whether the common law relating to marriage is, or ever was, part of the law of this state.

If the early acts in this state prove anything, they prove that the common law relating to marriage was never at any time in the history of this state abrogated or abolished by the Legislature.

The Constitution of 1776 makes the common law part of the law of this state. The well-known case of *Clauson v. Primrose*, in 4 *Del. Ch.* 666, is cited as authority for the proposition that only · such part of the common law was adopted at the time of our separation as was applicable to the existing circumstances and institutions of our people. That was a case in which the doctrine of ancient lights was involved. It was not pointed out by counsel for defendants how or why the circumstances and institutions of our people at the time of our separation from England were different, so as to make the common law relating to marriage inapplicable. There was nothing in our circumstances or institutions to cause the common law on the subject to be considered inapplicable, and practically all of the states of the Union have recognized the common law on the subject excepting in those states where statutes have been passed expressly nullifying such marriages.

The law regulating marriages, included in the laws agreed upon in England at the time of the foundation of the colonies, applied to all of the colonies, and did not in any sense abolish non-ceremonial marriages at the common law.

Under *paragraph* 2 of defendants' supplemental brief, it is contended that the facts set forth in the agreed statement of facts do not constitute a marriage good at common law, for three reasons. The first reason is:

(a)   That to create a good common-law marriage there should be an agreement per verba de praesenti between the parties by which they agree to be husband and wife.

It is elementary that marriages at common law were valid either per verba de præsenti or per verba de futuro cum copula, and citation of authority would hardly seem to be necessary. The facts set forth in the agreed statement of facts, however, disclose a marriage in every sense one per verba de præsenti. The language in *paragraph* 3 of the agreed statement of facts is substantially that of the wife herself, taken down stenographically in the presence of counsel for both sides in this case, and from this it is clear that the parties did, "in language mutually understood   *   *   *accept each other as a husband and wife" (quotation taken from 1 Bishop on Marriage, Divorce and Separation, *section* 320), and that the parties thereupon "went to live together as man and wife and became known to their relatives, friends and neighbors as man and wife, and the said Frances Stillwell assumed the name of Frances Goslin and was thereafter known by that name" (quotation taken from *paragraph* 3 of agreed statement of facts).

The only thing about the arrangement pertaining to the future was the matter of getting quarters in which to live, which appears from the agreed statement of facts was done without delay, and there is nothing in the agreed statement of facts from which any understanding or agreement can be found that the parties agreed that they were to enter into the marriage at some time in the future. The agreement was clearly one in words of present consent. Nothing appears from which any inference may be drawn that the parties were agreeing to enter into a meretricious relation, but on the contrary it appears that the parties immediately went to live together as husband and wife, and the woman assumed her husband's name and became known as his wife to their relatives friends and neighbors.

Statement.

Under *paragraphs* (b) and (c) of *paragraph* 2 of defendants' supplemental brief it is contended:

"(b)    That cohabitation is not sufficient to sustain a common-law marriage.

"(c)    That general reputation is not sufficient to sustain the validity of a common-law marriage."

The argument on this point seems to be based on the theory that the fact of cohabitation during the long period of years is relied upon to establish a marriage. Such is not the case. It is the agreement between and consent of the parties that they assume the marriage relation which created or constituted the marriage, and the cohabitation pursuant thereto for a period of about 14 years, during which time they held each other out and were known to their relatives, friends and neighbors as husband and wife, was evidence of such informal or consensual marriage. The cohabitation itself did not make the marriage, but was merely evidence of a previously agreed upon informal or consensual marriage.

If judicial decision is to be influenced by a desire to discourage such marriages, such desire will never be accomplished or aided by holding such marriages unlawful; for, if declaring informal marriages invalid would have any effect at all, it would be more likely to have effect directly to the contrary. Men entering into such relationship would know that it would always be within their power to terminate same at their pleasure.

If the Legislature, in making provision so that marriage should be the secure and stable institution that it ought to be, considered that informal or common-law marriages should be abolished, then it could and would have so provided. Not only has the Legislature not done this, but on the contrary, in the last legislative expression on the subject, as found in *Revised Code* 1915, § 3000, we find direct and express recognition of the validity and existence of informal or common-law marriages in this state, in the following language:

"* * * Nothing in this chapter contained shall be deemed or taken to render any common law or other marriage otherwise unlawful invalid by reason of the failure to take out a license as herein provided."

Statement.

SUPPLEMENTAL BRIEF FOR DEFENDANTS.

1.   That no common-law marriage is valid in the state of Delaware for the following reasons:

(a)   A marriage is not valid at common law without a ceremony.

(b)   That even if a marriage were valid at common law without a ceremonial marriage such common law was never adopted as part of the law of this state.

2.   That the facts set forth in the agreement do not constitute a marriage good at common law for the following reasons:

(a)   That to create a good common-law marriage there should be an agreement per verba de praesenti between the parties by which they agree to be husband and wife.

(b)   That cohabitation is not sufficient to sustain a common-law marriage.

(c)   That general reputation is not sufficient to sustain the validity of a common-law marriage.

It was stated in the original brief that at the time of the foundation of the colonies certain laws were agreed upon in England, including a law regulating marriages.   That shortly thereafter, in 1706, an act was passed "Preventing Clandestine Marriages," which act expressly provided that the marriages pursuant to the act should be deemed authentic and legal.

This act was in force up to and including the Revolution and until 1788.

The  Constitution of 1776, § 25  (1 Del. Laws, Append. p. 89), states:

"The common law of England, as well as so much of the statute law as have been heretofore adopted in practice in this state, shall remain in force, unless they shall be altered by a future law of the Legislature; such parts only excepted as are repugnant to the rights and privileges contained in this Constitution and the Declaration of Rights, etc., agreed to by this convention."

It will be noticed that the common law and the statute law are not "adopted" in this state, but that such common law and statute law "remain" in force, which means that part of the common law and that part of the statute law theretofore in force should "remain" in force.

The court in *Starr & Co. v. Lewis & Purden, 3 Harr.* 40 (41, *note*), states:

" The common law of England is in force in this state only so far as it has been adopted in practice."

The Constitution of New Jersey of 1776 was identical in language with our own, as to the fact that common law should remain in force.

In *State v. Hudson County,* 30 *N. J. Law,* 141, the court held that as the colonial statutes had covered the subject-matter, there was in 1776 "no such English common law to be continued."

It is earnestly contended that the original legislative authorities in the acts approved in England and in the act of 1706, and all subsequent acts, covered the entire subject of regulation of the marriage relation and as stated in *Lord & Polk Chemical Co.,* 7 *Del. Ch.* 262, 44 *Atl.* 777:

" If theLegislature undertakes to provide for the regulation of human conduct in respect to specific matter or thing already covered by the common law, and parts of which are omitted from the statute, such omissions may be generally taken as evidences of the legislative intent to repeal or abrogate the same. Take, for example, our own statute of frauds. It does not contain some of the provisions of the English statute, but the omitted portions thereof, for the reasons before stated, have never been held to be in force in this state, since the enactment of our own statute."

See, also, *State v. Williams,* 9 *Houst.* 526, 18 *Atl.* 949; *State v. Donovan,* 5 *Boyce,* 50, 90 *Atl.* 220; *Sackett v. Sackett,* 8 *Pick. (Mass.)* 309.

There has been no time in the history of Delaware as a colony or state when there has not been a full and complete statute regulating marriages, the effect of all of which was to prohibit marriages entered into other than as prescribed by said statutes.

2. That the facts set forth in the agreement do not constitute a marriage good at common law for the following reasons:

(a) That to create a good common-law marriage there should be an agreement per verba de praesenti between the parties by which they agree to be husband and wife.

(b) That cohabitation is not sufficient to sustain a common-law marriage.

(c) That general reputation is sufficient to sustain the validity of a common-law marriage.

The agreed statement of facts, being the stenographic notes of the wife's own statement, are to be taken as true. In this

there is no suggestion of per verba de præsenti. That contracts per verba de futuro, although followed by cohabitation, do not constitute a marriage, is fully borne out by the following cases: *Robertson v. State*, 42 *Ala.* 509; *Cheney v. Arnold*, 15 *N. Y.* 345, 69 *Am. Dec.* 609; *Duncan v. Duncan*, 10 *Ohio St.* 181.

(2) (b) and (c). There is a distinction recognized in all the authorities between cohabitation and repute as "establishing" marriage and as being "circumstantial evidence" of a marriage. All of the authorities agree that neither cohabitation nor repute can make a marriage, and almost all agree that they can be used as evidence in establishing a pre-existing marriage.

The agreement in this case plainly shows, however, that no marriage preceded the cohabitation, so that neither cohabitation nor repute can in this case be used as circumstantial evidence tending to show something which is admitted did not exist prior to the cohabitation. This is borne out conclusively by the following authorities: *State v. Wilson*, 5 *Pennewill*, 77, 66 *Atl.* 227; *Letters v. Cady*, 10 *Cal.* 533; *McKenna v. McKenna*, 180 *Ill.* 577, 54 *N. E.* 641; *Dunbarton v. Franklin*, 19 *N. H.* 257; *Hunt's Appeal*, 86 *Pa.* 294; *Claves v. Claves (Fla.)* 84 South. 672.

1. The common law as to marriages was never adopted in this state.

2. While the marriage statutes have been amended, at no time has there been a moment when common law could have been in force and the act of 1893 compels the conclusion that a common-law marriage was invalid. *Morril v. Palmer*, 68 *Vt.* 1, 33 *Atl.* 829, 33 *L. R. A.* 411; *Milford v. Worchester*, 7 *Mass.* 48; *Denison v. Denison*, 35 *Md.* 361; *Norman v. Norman*, 121 *Cal.* 620, 54 *Pac.* 143, 42 *L. R. A.* 343, 66 *Am. St. Rep.* 74; *Comm. v. Munson*, 127 *Mass.* 459, 34 *Am. Rep.* 411.

Every reason compels the rejection of the doctrine of the common law in this state, regarding marriages. If valid, all marriage laws are useless.

PENNEWILL, C. J., delivering the opinion of the court:

As we understand the argument, the contentions of the plaintiff may be summarized as follows:

(1)   That the facts agreed upon in the case stated show there was a marriage between the parties, good at common law.

(2)   That at common law an informal or nonceremonial marriage was valid if there was an agreement per verba de præsenti between the parties that they would live together as husband and wife and that there was such an agreement in this case.

(3)   That the common law of England was adopted by this state, and that part of it which related to marriage became the law of this state, and was such at the time the marriage in question was consummated.

(4)   That while the statutes of this state have directed how marriages should be performed and have gone so far as to declare when they shall be valid, no statute has ever declared that a common-law or nonceremonial marriage shall be void or invalid.

(5)   That practically every state in this country having statutes substantially similar to ours, and in which there is no statute making such marriages invalid, has recognized them as valid.

(6)   That our present marriage law expressly recognizes such marriages as valid by providing that nothing therein contained shall be deemed or taken to render any common-law or other marriage, otherwise lawful, invalid by reason of the failure to take out a license as is therein provided.

The contentions of the defendants are:

(1)   That the common law respecting marriages was never adopted in this state.

(2)   That, even if it was, the marriage in question was not a good marriage at common-law because not contracted by words of present consent.

(3)   That a nonceremonial marriage was not good at common law.

(4)   That while a large majority of the states of this country have seen fit to recognize a common-law or nonceremonial mar-

riage there are some that have not, and reason as well as sound policy require that our state should not recognize such a marriage.

(5)   That the legislation of this state, while not expressly declaring such a marriage void or illegal, nevertheless, through its entire history unmistakably shows that only a ceremonial marriage is valid, and by the strongest kind of implication declares that a common-law or nonceremonial marriage is invalid.

We have to admit that the preponderance of judicial and text authority is in favor of the validity of a nonceremonial marriage, even when the statutes direct how a marriage shall be performed, and when it shall be legal.   And all such adjudications are based on the legal principle that while such statutes regulate the mode of entering into the contract of marriage, they do not confer the right.   Hence they are not within the principle that, where a statute confers a right and confers a remedy for its enforcement, the remedy is exclusive.   It is conceded, of course, that a statute may take away a common-law right, but it is insisted that there is always a presumption that the Legislature has no such intention unless it is plainly expressed.

In the leading case of *Meister v. Moore*, 96 *U. S.* 76, 24 *L. Ed.* 826, the court said:

"A statute may declare that no marriages shall be valid unless they are solemnized in a prescribed manner; but such an enactment is a very different thing from a law requiring all marriages to be entered into in the presence of a magistrate or a clergyman, or that it be preceded by a license, or publication of banns, or be attested by witnesses."

While the defendants contend that a marriage is not valid at common law without a ceremony, they do not insist on such contention in this case, "because the great majority of the states hold that such marriage was valid at common law," and they claim that such a contention is unnecessary for the determination of this case.

The defendants contend that the common law respecting marriage was never adopted in this state because the entire subject was fully covered by legislation, which negatives the existence of the common law in this particular.   It is this principle upon which the defendants mainly rely.

In this state it has been held that the common law of England is in force only so far as it has been adopted in practice, and so far as concerns our condition and circumstances. Constitution of 1776, § 25; *Starr & Co. v. Lewis & Purden*, 3 *Harr.* 40; *State v. Williams*, 9 *Houst.* 526, 18 *Atl.* 949.

It is argued that when this state had covered the subject of marriage by legislation, and such legislation was inconsistent with the common law, it cannot be held that the common law respecting marriage has ever been adopted in practice, or was adopted to our circumstances and conditions.

[1] It is undoubtedly true that the legislation of this state respecting marriage fully covers the subject, and shows by the strongest implication, at least, that the common law, so far as it relates to marriage, was not favored or applicable. We are of the opinion, therefore, that such common law has never been adopted in this state.

If the history of the state's legislation is carefully considered, it will be found that from colonial times private, loose or clandestine marriages have not only been discouraged, but the effort has been to prevent them. Statutes have been enacted for the express purpose of preventing "clandestine marriages." Our marriage law makes void a marriage solemnized by a person having no authority in that behalf unless one of the parties believed it was lawful.

And so it is manifest from the history of marriage legislation in this state that a secret, clandestine or nonceremonial marriage was never intended to be valid. The law has at no time contemplated that it should be recognized. If a marriage entered into without any publicity or ceremony at all must be held valid, why should there be any law prescribing how a marriage shall be consummated or what shall constitute a legal marriage?

[2] Our conclusion is that no matter what marriage statutes and their judicial interpretation in other states may be, a fair construction of our own statutes makes a secret and nonceremonial marriage illegal and void. And we base our conclusion on the apparent meaning and object of legislation on the subject,

as well as upon the manifest policy of the state. To make a good and legal marriage something more is required than cohabitation and repute. Even a secret agreement to live together as husband and wife, and a reputation as such among neighbors and friends, will not make it a valid marriage.

In *Milford v. Worchester*, 7 *Mass.* 48, Chief Justice Parsons, in delivering the opinion of the court, said:

"But it has been argued, that this marriage, though not solemnized pursuant to the statute, is yet a lawful marriage, had between parties competent to contract marriage, and not declared void by any statute.

"This ground for supporting marriages deserves consideration; as, if it be tenable, the consequences are very extensive. Where the laws of any state have prescribed no regulations for the celebration of marriages, a mutual engagement to intermarry, by parties competent to make such contract, would in a moral view be a good marriage, and would impugn no law of the state. But when civil government has established regulations for the due celebration of marriages, it is the duty, as well as the interest, of all the citizens to conform to such regulations. A deviation from them may tend to introduce fraud and surprise in the contract; or by a celebration without witnesses, the vilest seduction may be practiced under the pretext of matrimony. *. *. *. If this be not a reasonable inference, fruitless are all the precautions of the Legislature.    *    *    *

"It has been truly observed by the counsel for the plaintiff that a marriage engagement of this kind is not declared void by any statute. But we cannot thence conclude that it is recognized as valid, unless we render in a great measure nugatory all the statute regulations on this subject."

In *Commonwealth v. Munson*, 127 *Mass.* 459, 34 *Am. Rep.* 411, the court said:

"Under all changes in the form of the statutes it has always been assumed in this commonwealth, and in the state of Maine, which was originally a part thereof, that (except in the single case of Quakers or Friends    *    *    *) a marriage which is shown not to have been solemnized before any third person, acting or believed by either of the parties to be acting as a magistrate or minister is not lawful or valid for any purpose.    *    *    *

"The presence of a person officiating, or at least believed to be officiating, as a justice or minister being    *    *    *    clearly required, according to a long course of legislative action and of judicial opinion, to constitute a valid marriage in the commonwealth, it would be superfluous to examine the English decisions, or the cases cited at the argument showing that a different rule prevails in some other parts of the Union. Whether it is wise and expedient so to change the law of Massachusetts as to allow an act, which so deeply affects the relations and the rights of the contracting parties and their offspring, to become binding in law by the mere private contract of the parties, without going before any one as a magistrate or minister, is a matter for legislative and not for judicial consideration."

In *Denison v. Denison*, 35 *Md.* 361, the court used the following language:

"We think we are safe in saying, that there never has been a time in the history of the state, whether before its independence of Great Britain or since, when some * * * · celebration was not deemed necessary to a valid marriage. * * * It is true, the act contains no express prohibition or declaration of absolute nullity of marriages contracted per verba de praesenti; but it is plainly to be perceived that such marriages, if allowed, would contravene the spirit and policy of the act. The implication from the provisions of the act are exceedingly strong against such marriages, and the practice and custom of the people of the state have been so universally in conformity with what would appear to have been the policy and requirements of the law, that such custom has acquired the force and sanction of law, even though a question could be made as to the technical construction of the act itself."

We do not think it necessary to discuss the question whether the civil or canon law, under which a nonceremonial marriage was valid, became a part of the common law of England and was adopted in this country after the separation. Many courts have ably and learnedly discussed the question, but it is perhaps of historical rather than practical interest now.

In *Milford v. Worcester*, *supra*, the court said:

"When our ancestors left England, * * * it is well known that a lawful marriage there must be celebrated before a clergyman in orders."

In the Denison Case, above mentioned, it was said:

"But the civil and canon laws, as such, never had force in England. They were regarded and accepted only as part of the common or unwritten law.

"It is true the common law of England has been adopted by the people of this state, but only so far as it could be made to fit and adjust itself to our local circumstances and peculiar institutions. The ecclesiastical policy of England forms no part of the common law as we have adopted it. We have in our system no tribunal, as in England, clothed with power and jurisdiction to enforce the solemnization of marriages between parties contracting per verba de praesenti.

"In the celebrated case of *Reg. v. Millis*, 10 *Cl. & Fin.* 534, in the House of Lords (1843), the opinion of the judges of England was taken, and by their unanimous opinion it was declared: 'That by the law of England as it existed at the time of the passing of the marriage act, a contract of marriage per verba de praesenti was a contract indissoluble between the parties themselves, affording to either of the contracting parties by application to the spiritual court the power of compelling the solemnization of an actual marriage, but that such contract never constituted a full and complete marriage itself, unless made in the presence and with the intervention of a minister in holy orders.' "

In the case of *Commonwealth v. Munson*, *supra*, it was said:

Opinion.

"In Massachuesetts, from very early times, the requisites of a valid marriage have been regulated by statutes of the colony, province, and commonwealth, and the canon law was never adopted; and it was never received here as common law that parties could by their own contract, without the presence of an officiating clergyman or magistrate, take each other as husband and wife, and so marry themselves."

We are of the opinion that the civil or canon law respecting marriage, even if it became a substantive part of the common law of England, was never adopted in this state.

[3] There would probably be no dissent from our conclusion that the marriage in question was not a valid marriage, if our present law did not apparently recognize a nonceremonial marriage by providing that a common-law or other marriage otherwise lawful should not be affected by the failure to take out a license.

It is not easy to tell just what the Legislature meant by this expression, but in view of what Legislatures in this state had done in prescribing what should make a legal marriage and their great particularity in directing the proper procedure, the conclusion must be that the expression means simply this: That if a marriage had been performed in compliance with the laws of the state in all other respects, it would not be held invalid because of the failure to take out a license therefor. That being so, the Legislature must have thought a common-law marriage required a ceremony of some kind, and was something more than a civil or canon law contract. There is authority to support or justify such thought, as appears from the cases above mentioned.

It is impossible to escape the conclusion that many courts in this country have construed marriage laws very liberally because, as the Rhode Island court expressed it, "to make marriages void and children illegitimate, by implication, is a serious thing." The desire to make the offspring of informal marriages legitimate is, of course, commendable, and legalizing such marriages would be equally so if they were entered into with an honest intent by either party; that is, with the belief that the marriage was lawful. But unfortunately such intent or belief is exceedingly rare. Usually in such marriages the relation in the beginning is nothing other than licentious, and the question is whether the interest of

the innocent children of such unions are paramount to the good of society.    We know it is essential in a nonceremonial marriage that there shall be an agreement in the beginning that the parties assume the relation of husband and wife;   they must presently agree they will live together as such.   But the trouble is that such agreement can rarely be shown except by their conduct, and there is no perceptible difference in this regard between innocent and guilty conduct.   Hardly ever do parties to such relation declare their purpose or intent in the beginning, and, therefore, it must be shown by circumstances;   that is, by their conduct—cohabitation.

And the recognition of informal marriages to make innocent children legitimate may be attended  with unfortunate results in many cases.   Suppose, for example, that after continued cohabitation, and reputation as married people, and after children are born, there comes, as in the present case, separation of the parents, and either party contracts a similar marriage with another person and raises children, what will be the status of the innocent offspring of the later union?    There cannot be two valid marriages.    To put a more extreme and difficult case, suppose, after the separation, either party contracts a marriage in a perfectly legal manner and raises children.   What would be the situation of the parent and the children?

It seems, therefore, that legalizing an informal marriage so that the children shall be legitimate may cause troubles and complications of a very serious character to parents, children and society.

It is the opinion of the court that the Legislature having dealt intelligently, carefully and fully with the subject of marriage, and having declared what shall constitute a legal marriage, the court may assume that a marriage contracted otherwise is unlawful and invalid.  If the law works a hardship in any case upon parent or child, there is an obvious and practicable remedy, viz. an application to the Legislature to validate the marriage and legitimize the children.

It would be, we take it, nothing short of shocking to our people if the court should in this day of easy marriage and frequent divorce hold that a secret, clandestine or informal marriage is valid in this state. Even if the question of the validity of such a marriage was a doubtful one, the interests of innocent children would have to be weighed against the protection of the community and the good of society. We are not inclined to make marriages more easy or divorces more frequent than they are, and upon the whole question our minds are clear that what is called a common-law marriage is invalid. As already said the safest and wisest course, for the correction of any wrong or relief of any hardship, is to apply to the Legislature, which may, and doubtless will, in any proper case, by specific act, validate a marriage which, under the general law, is invalid.

Some of the states in which the court have recognized non-ceremonial or common-law marriages because their laws did not expressly make them invalid have since made them invalid by express statutory provision. No doubt this was done in obedience to what the law-making bodies conceived to be sound reason and wise public policy under existing conditions; and it is difficult to escape the belief that many courts that have held such marriages good might be of a different opinion to-day, if the question was a new one. But while we know that the good of society requires that a marriage, to be valid, should be something more than the mere agreement of the parties to live together, we base our conclusion in this case on the obvious meaning of the legislation of our own state on the subject.

We are clearly of the opinion that a common-law or a non-ceremonial marriage entered into in this state is not a valid marriage.

It is ordered that this opinion be and the same is hereby certified to the Superior Court for New Castle county.

[Signed by the Judges.]

Whereupon the Superior Court made the following order:

And now to wit, this 1st day of June A. D. 1921, the opinion of the court in banc having been certified to this court, and whereas in the opinion of the court in banc the said Frances Goslin Hendrixson was not the legal wife of Paul Goslin, under the laws of the state of Delaware, whereupon this court finds that the said Frances Goslin Hendrixson was not the legal wife of the said Paul Goslin, under the laws of the State of Delaware, and, therefore, is not entitled to any share of the funds remaining in the hands of the said administratrix, and, therefore, judgment is entered in favor of George P. Goslin, Edward S. Goslin and Marian David, each for the sum of $321.04, against Frances Goslin Hendrixson, administratrix of Paul Goslin, deceased, and Fidelity & Deposit Company of Maryland, a corporation of the state of Maryland, and in favor of Robert M. Goslin and Dorothy Buck, each for the sum of $160.52, against Frances Goslin Hendrixson, administratrix of Paul Goslin, deceased and Fidelity & Deposit Company of Maryland, a corporation of the state of Maryland.